207 N.J. Super. 371 (1985)
504 A.2d 683
MAUREEN RASPA, PLAINTIFF,
v.
NICHOLAS RASPA, DEFENDANT.
Superior Court of New Jersey, Chancery Division Bergen County, Family Part.
November 4, 1985.
*373 Harvey R. Pearlman, for plaintiff (Friedman, Kates, Pearlman & Fitzgerald, attorneys).
Anthony C. Sartori, for defendant.
KRAFTE, J.S.C.
The unique set of facts in this divorce action presents myriad matrimonial issues, resolution of which turn on the threshold question of whether the parties' marriage is valid, or whether it was null and void from its inception because of the alleged invalidity of plaintiff's prior Mexican divorce. A determination that the marriage is invalid will render the remaining questions of equitable distribution moot.
The parties to this action met in 1968, each having been previously married. Plaintiff, Maureen Raspa, was divorced from her prior husband, Daniel Donohue, by a Mexican divorce decree. She had custody of their two children, Terence, age three, and Sean, five-months old. Defendant, Nicholas Raspa, was divorced from his first wife by a decree issued in the State of Alabama, and he also had custody of the child of that marriage, Mark, age four.
In the early part of 1969, the parties began looking at houses for sale, which eventuated in Nicholas' purchasing a home in Rutherford, New Jersey, and title was closed on May 1. Shortly thereafter, on May 4, 1969, the parties were married and began residing in the Rutherford home with their children.
Sometime in mid-1972, Nicholas became concerned about the validity of his earlier divorce, after reading several newspaper *374 articles which reported the illegality of some Alabama divorces. After consulting with his attorney, Nicholas procured a second divorce decree from his first wife, this time in New Jersey, on June 27, 1972.
The parties continued to live with one another and the three children, and in 1976 Maureen became pregnant with Nicholas' child. Before the birth of their child, the parties decided to engage in a second marriage ceremony, which took place on December 28, 1976. Their daughter, Nicole Raspa, was born March 17, 1977.
Sometime thereafter, discord arose between the parties, and plaintiff filed for divorce on the ground of extreme cruelty in June 1984. Defendant filed an answer and counterclaim, seeking an annulment of the marriage or, in the alternative, a divorce.
This Court is now faced with the following questions: (1) does a valid marriage exist between the parties; (2) if so, what are the relevant dates for inclusion of assets in the marital estate for purposes of equitable distribution; and (3) is the marital home, which was purchased by defendant before the marriage, subject to equitable distribution? As previously stated, a finding of invalidity of the marriage will obviate the need to address the remaining issues.
Defendant contends that plaintiff's prior divorce was invalid, and hence the parties' marriage was null and void from its inception. Upon that premise, defendant asserts that equitable distribution does not apply. In the alternative, he argues that should this court find plaintiff's Mexican divorce to be valid, then the appropriate dates for acquisition of assets subject to equitable distribution are December 28, 1976 and June 1982. Defendant contends that the marital estate should include only those assets which were acquired after their second marriage ceremony, because even if plaintiff's divorce were valid, his Alabama decree was not and thus he was under a disability to marry in 1969. He argues that it was only after he obtained a *375 second divorce from his prior wife and went through a second ceremony with plaintiff that their marriage actually began. The terminal date of June 1982 is urged by defendant as being the date when the marital relationship was no longer viable, the parties having then moved into separate bedrooms in the marital residence, communicating only minimally. He further asserts that the Rutherford home is not subject to equitable distribution, having been purchased by defendant prior to the marriage.
Plaintiff, on the other hand, asserts the validity of both her Mexican divorce and subsequent marriage to defendant. She argues that even if this court finds her prior divorce to be invalid, defendant is estopped from denying the validity of the parties' marriage. Finally, plaintiff claims that she is entitled to one-half interests in the Rutherford home and all other assets acquired between May 4, 1969, the date of their first ceremony, and June 1984 when she filed her complaint for divorce.

I.

VALIDITY OF THE PARTIES' MARRIAGE
Initially this court must decide which party carries the burden of proving the (in)validity of the marriage.
Defendant contends that the burden rests with plaintiff to prove that a valid marriage exists, in order to obtain the relief she seeks. He maintains that plaintiff has not proven to this court that her Mexican divorce was valid, and thus has failed to demonstrate the existence of a valid marriage between the parties.
In contrast, plaintiff asserts that once she has proven that there was a marriage between the parties, a heavy burden is cast upon defendant to prove the invalidity thereof by clear and convincing evidence. Plaintiff maintains that this burden of *376 proof has not been met, and that in any event, defendant is estopped from denying the validity of their marriage.
Introduced into evidence at trial were the following documents: (1) final divorce decree between Daniel Donohue and plaintiff issued by the Court of First Instance of Calpulalpan, State of Tlaxcala, Mexico, dated July 20, 1967; (2) certificate of marriage between the parties of May 4, 1969; (3) final judgment of divorce between defendant and his first wife, dated July 27, 1972, issued by the Superior Court of New Jersey; and (4) certificate of marriage between plaintiff and defendant, dated December 28, 1976.
With regard to the Mexican divorce, plaintiff testified that she never received a summons and complaint, never appeared in any proceeding in Mexico, and received the final decree in the mail. She stated that she was told by someone that notice of the action was published in the newspaper.
Plaintiff further testified that her former husband Donohue told her that he personally appeared before the Mexican court, although the divorce decree states only that he submitted to the jurisdiction and competence of the court "through his juridical representative." Throughout the document plaintiff's and her children's names are incorrectly stated to be "Maurin" for Maureen, "Edward Tenence" for Terence, and "Sharon Christopher" for Sean. It is also stated in the decree that the then Mrs. Donohue did not answer the complaint, although she was summoned "by means of edicts that were published according to the law."
Defendant testified that in no way did he participate in plaintiff's Mexican divorce, not having met her until at least a year later. When asked what his understanding was as to plaintiff's marital state when the parties met, defendant answered "she was divorced," which he based upon the Mexican document. Having had no legal training as to the laws of the State of New Jersey in 1969, defendant thus testified that he *377 had no knowledge at that time that plaintiff was under a disability to enter a marriage in this State.
Both parties testified that they were fully aware of each other's marital history prior to their 1969 wedding, and brought with them their respective divorce documents when they obtained their first marriage license.
Initially this court finds that the law of this State does not require plaintiff to prove the validity of her prior divorce or the parties' marriage, as defendant urges. Rather, once plaintiff shows that the parties were in fact married, the burden of proving invalidity shifts to defendant, and it must be met by clear and convincing evidence. The Supreme Court enunciated this proposition most clearly in Newburgh v. Arrigo, 88 N.J. 529 (1982), wherein it was held that
... irrespective of the factual context in which the issue may arise, the last of two or more marriages is presumptively valid. The presumption of validity may be overcome only by clear and convincing evidence that (1) there was a prior marriage, (2) the prior marriage was valid, and (3) the prior marriage was not terminated by death or divorce before the latest marriage ... [F]urther, ... where one attacks the validity of a divorce obtained in a foreign state or country, the challenger must prove all asserted defects, including lack of jurisdiction in the foreign court. In all respects, the burden rests not upon the party defending the most recent marriage, but upon the challenger to demonstrate the invalidity of the prior divorce. [at 538]
Having before it in evidence not one, but two certificates of marriage between these parties, this court finds that the burden is upon defendant to overcome this presumption of validity. Defendant fails to do so.
Defendant relies on Warrender v. Warrender, 79 N.J. Super. 114 (App.Div. 1963), aff'd 42 N.J. 287 (1964), for the proposition that the Mexican court's lack of jurisdiction resulted in an invalid divorce decree which was, in effect, a sham. In some respects, the Mexican divorce here in issue resembles that which the Warrender court found to be invalid, particularly in that there was not "the faintest pretense of adjudication by the decree of either residence or domicile of either of them in Mexico when rendered." Id. at 118. It is undisputed that *378 plaintiff never received a summons and complaint, nor did she answer or appear in the proceedings. She never received any type of notice of the Mexican action until after receiving the final decree. Thus there exists doubt that the manner in which plaintiff's divorce was obtained comports with our traditional notions of jurisdictional and due process requirements.
In face of such doubt, however, this court finds that defendant has not demonstrated by the requisite clear and convincing evidence that the divorce was invalid and should be given no effect. The proofs at trial lacked any showing that Mr. Donohue did not go to Mexico, or that he did not live in Mexico, or that what he obtained was a "mail-order" divorce. And although plaintiff admittedly did not receive a summons and complaint, defendant did not introduce any evidence that would show that notice was not in fact effected by publication. Defendant has failed to meet his burden, under Newburgh, of disproving every reasonable possibility that the Mexican divorce was valid.
Furthermore, defendant's reliance on Warrender, is misplaced for several reasons. First, the Warrender decision was rendered prior to the substantial amendments in the law brought about by the Divorce Reform Act of 1971, L. 1971, c. 212, N.J.S.A. 2A:34-1, et seq. Second, Warrender relied in part on the early case of Tonti v. Chadwick, 1 N.J. 531 (1949), which held a Mexican divorce to be of no effect in New Jersey, but which case was overruled in Kazin v. Kazin, 81 N.J. 85 (1979).
Prior to Kazin, New Jersey courts hesitated to accord recognition to foreign divorce decrees which were based upon jurisdictional and substantive grounds inconsistent with those of this State. Indeed, the Tonti decision was rendered at a time when the statute provided that a foreign divorce decree "for a cause which occurred while the parties resided in this State, or for a cause which is not ground for divorce under the laws of this state" was of no force and effect. 1 N.J. at 535-536.
*379 As pointed out in Kazin, the Divorce Reform Act "both repealed and substantially amended prior legislation controlling marital relationships." 81 N.J. at 92. Moreover, Kazin recognized that "equitable principles have moved to the forefront," and that
[i]n this legal and social milieu, courts are well counseled to give full range to equitable doctrines in dealing with matrimonial controversies. [Id. at 93-94]
In accordance with that directive, this court holds that even if defendant had demonstrated that plaintiff's Mexican divorce was invalid, he is estopped from denying the validity of the parties' marriage. This is a court of equity, and as such, cannot allow defendant to disavow his actions and course of conduct over a 15-year period, and in effect walk away from plaintiff as if they had been nothing more than cohabitants since 1969.
In Kazin the Court said that
... estoppel has been applied to thwart a spouse from attacking his or her own divorce. Estoppel has also been applied, however ... to prevent an individual from attacking his spouse's prior divorce.
In a number of cases, courts have forbidden a husband from attacking the prior divorce decree of his wife, where he took an active role in helping her procure that decree. Estoppel has also been applied, however, where the second husband's involvement in his spouse's prior divorce was relatively passive but, in marrying her, he himself relied on that divorce. [81 N.J. at 95; emphasis supplied; citations omitted]
Unlike Kazin, neither party herein contends that defendant took any part in procuring the Mexican divorce. However, it is clear that defendant relied on plaintiff's prior divorce when, in 1969, the parties married. Furthermore, at no time during their many years together does it appear that defendant ever questioned the validity of the decree, or if he did, he never took any steps to persuade plaintiff to correct her defective divorce, as he did in his own case. In fact, even after he obtained his second judgment of divorce from his prior wife, he married plaintiff a second time, obviously still relying on the Mexican divorce.
*380 The facts reveal that these parties lived together from 1969 to the time of this divorce action without interruption. They held themselves out as husband and wife. While both parties worked, plaintiff, in addition, assumed all of the traditional roles of a homemaker, such as maintaining the household, doing laundry, cleaning and cooking. Together they raised their respective children as if they were their own, as well as the daughter born of the marriage. They pooled their incomes and applied same to household expenses. Thus, from all of their actions, these parties appeared to the whole world to be Mr. and Mrs. Nicholas Raspa.
Defendant now attempts to negate all this, claiming that their marriage was null and void, that plaintiff is still married to Daniel Donohue, and that equitable distribution should not apply. This court holds that he is estopped from asserting such a position.
However, this is not a case of true equitable estoppel, where one engages in conduct amounting to a representation or concealment of material facts, the truth of which is unknown to another, who is induced to rely thereon. See Clark v. Judge, 84 N.J. Super. 35, 54 (Ch.Div. 1964), aff'd 44 N.J. 550 (1965). In the usual case of equitable estoppel, the party making the representation is later estopped from denying the truth thereof.
Here, defendant did not represent or conceal material facts, nor was there reliance on the part of plaintiff. Rather the situation is reversed: it was plaintiff who (in good faith) represented that she was divorced; and defendant who relied thereon. But now it is defendant who attempts to deny the existence of a valid marriage.
This case thus falls within the concept of "quasi-estoppel," which Kazin described thusly:
The equitable rule precluding individuals from attacking foreign divorce decrees "[has] not [been] limited to situations of what might be termed `true estoppel' where one party induces another to rely to his damage upon certain representations ..." Restatement (Second) of Conflict of Laws § 74, Comment (b) (1971), but has also encompassed situations sometimes termed "quasi-estoppel" where *381 an individual is not permitted to "blow both hot and cold," taking a position inconsistent with prior conduct, if this would injure another, regardless of whether that person has actually relied thereon. Brown v. Brown, 274 Cal. App.2d 178, 188-189, 82 Cal. Rptr. 238, 244-245 (Ct.App. 1969). [81 N.J. at 94]
This court cannot more effectively describe defendant's conduct than by use of the above expression: he attempts to blow both hot and cold. His present position is entirely inconsistent with his actions and course of conduct over the last fifteen years, having lived with plaintiff for that entire period and having married her twice.
With respect to the fact that there were two ceremonies, defendant offers the following explanations. He testified that the first was the result of a Rutherford zoning ordinance in effect in 1969, which prohibited unrelated persons from cohabiting. Having just purchased the house, and wanting to live with plaintiff, he states that he married her after learning about this ordinance  that the existence of the ordinance was the very reason for marrying plaintiff. This court finds this explanation to border on the incredible, particularly in light of what subsequently transpired  a 15-year union and second marriage ceremony.
Defendant further testified that the 1976 ceremony took place because plaintiff was pregnant and he did not want his daughter "to be born a bastard." He claims that in the year between his second divorce, 1972, and the second marriage, 1976, he did not want to be and did not believe he was married to plaintiff, though the topic arose on numerous occasions and was the subject of many arguments between the parties. Although defendant asserts that he believed that during that four-year period the parties were not married, this position is inconsistent with his earlier position  that the parties could not live together because of the ordinance. Additionally, defendant offered no proof that his Alabama decree was invalid, other than his concern after reading newspaper articles. He did not show clearly and convincingly that his was one of the divorce decrees that were reportedly illegal. Thus, this court is not *382 able to conclude that he was under a disability to enter a marriage in this State in 1969. On that basis, his argument regarding the parties' not being married between 1972 and 1976 must fail.
In light of all the facts presented, principles of equity lead this court to one conclusion, that is, that defendant is estopped from denying the validity of this marriage.

II.

EQUITABLE DISTRIBUTION
Having established that a valid marriage exists between the parties, this court is asked to determine the time period for inclusion of assets in the marital estate for purposes of equitable distribution.
Defendant argues that the period should commence with their second marriage ceremony, December 28, 1976, and terminate when the marital relationship deteriorated, some time around June 1982. It is plaintiff's position that the marital estate should be deemed to have begun with their first marriage ceremony, May 4, 1969, and run up to the filing of her complaint in June 1984. Thus the discrepancy between the two positions is substantial. While defendant would have the marital estate include assets acquired over a six-year period, plaintiff urges that the correct time span is some 15 years.
In Brandenburg v. Brandenburg, 83 N.J. 198, 201 (1980), it was held that "in the absence of a qualifying separation agreement, the date a complaint is filed will fix the termination date of a marriage for purposes of equitable distribution." In that case, the parties had separated and actually maintained separate residences, during which time the husband had paid the wife support. The husband objected to equitable distribution of assets acquired after the physical separation.
The Brandenburg decision retained the presumption that the marital relationship continues up to the filing of a complaint for *383 divorce. Id. at 206; see also Painter v. Painter, 65 N.J. 196 (1974).
The facts in this case make it clear that the terminal date of the marital estate should be the filing of the complaint. Here, in contrast to Brandenburg, the parties did not even maintain separate residences. They "separated" within the Rutherford home some time in 1982, each maintaining an individual bedroom. There was no evidence of any separation agreement, or that defendant paid anything to plaintiff by way of support or any division of marital property. Based upon the pragmatic considerations in Painter, and following the rule enunciated in Brandenburg, this court therefore holds that assets acquired by the parties up to the date of the filing of the complaint are subject to equitable distribution.
Furthermore, having found that defendant is estopped from denying the validity of the marriage and that defendant did not show that he was under a disability to marry plaintiff in 1969, this court sets the commencement date of the marital estate at May 4, 1969, the date of their first marriage ceremony.

III.

THE MARITAL HOME
The final issue to be resolved is that of the includibility of the Rutherford home in the marital estate. Because defendant purchased the house before the marriage, he claims it is immune from equitable distribution. Plaintiff resists such a position, asserting that she is entitled to one-half of the value of the house.
It is clear from the testimony at trial that the house was purchased by defendant several days prior to the parties' marriage. *384 Defendant signed the contract for sale and all documents at closing of title. Indeed, plaintiff did not even attend the closing. Defendant paid all closing costs and his name alone appears on all mortgage documents.
Defendant contends that it was the intent of the parties to have title in his name only. He claims that the down payment of $12,000 was his money, received from the sale of his prior home. Defendant testified that after acquiring said proceeds, he maintained them in an account in trust for his son, Mark, then age four. It was his intention, he claims, to use the $12,000 to purchase the home in his name, so that in the event anything happened to him, the home would be left to his son. It was thus Mark's "security." Defendant also stated that he had sought legal counsel on how to proceed with the purchase of the home, so that his intentions would be effectuated. It was, therefore, on the advice of counsel that defendant purchased the home prior to his marriage to plaintiff. According to defendant, plaintiff was fully aware that the deposit money was Mark's security, and that she was also aware that her name would appear on none of the documents reflecting ownership of the premises.
Plaintiff, however, testified that, although she was aware that the money was Mark's, defendant had told her that the $12,000 consisted of a "loan" from defendant's son which they were to repay. There was testimony neither as to any possible course of repayment, nor as to whether any such payments were ever made. In fact, defendant's son, now 20, did not testify at all. Plaintiff testified that although defendant never told her that she would have no interest in the house, she was never concerned by the fact that the house was in defendant's name alone, having had no reason at the time to worry about it.
Plaintiff also testified that prior to purchase, she actively took part in the selection of a home, dealing with real estate *385 agents and accompanying defendant "every weekend" to look at homes. At one point she stated that the parties postponed setting a wedding date during that early part of 1969, waiting to find "the right house." After purchase, plaintiff contributed her paycheck to the household and the parties' pooled funds were applied to normal household expenses. Indeed, it was defendant's testimony that he would give his paycheck to plaintiff, who in turn would pay the bills.
Strict application of the plain language of N.J.S.A. 2A:34-23 and prior caselaw would result in a finding that the marital home should not be subject to equitable distribution, as it was purchased in defendant's name alone prior to the marriage. See Painter v. Painter, 65 N.J. 196 (1974) and Mahoney v. Mahoney, 91 N.J. 488 (1982). However, this court finds such a strict application to be inequitable under the unique set of facts involved in this case.
While it is true that plaintiff had no involvement in the purchase of the house prior to closing other than assisting in its selection, this court finds that after purchase, and for the bulk of the time that the parties lived together, her earnings were applied to mortgage payments and other maintenance expenses. It is undisputed that the down payment was comprised of defendant's sole funds and that he alone was legally obligated to repay the mortgage. However, the fact remains that plaintiff contributed to the payment and maintenance of the house as well.
Furthermore, it appears from the testimony that, aside from the financial aspect, the house was intended to be and was for some 15 years the marital residence. It was purchased only days before the parties married, and they lived there with their children as a family since 1969. Plaintiff also testified that her father contributed his time and labor to projects around the property. Defendant would have this court ignore these facts, *386 by employing the strict rules that property owned by either party at the time of the marriage remains the separate property of that party, and that equitable distribution is restricted to assets acquired only during the marriage.
Recently it was held that equitable distribution is a statutorily-created remedy, and as such, Courts cannot extend the remedy beyond the plain language of the statute. Mangone v. Mangone, 202 N.J. Super. 505 (Ch.Div. 1985). In that case the Court refused plaintiff's request to consider the marital residence, purchased by defendant years before the parties married and while they were cohabiting, to be a distributable asset.
The facts in this case, however, are distinguishable from Mangone in that here the purchase of the house was "on the eve of marriage," rather than years prior. This Court recognizes the statutory limitation that only assets acquired "during the marriage" are subject to equitable distribution. Equity, however, dictates that the rule of immunity of assets acquired prior to marriage be excepted where the marital partners jointly select and purchase an asset in contemplation of marriage and for the purpose of the marital enterprise.
Designation of title in the name of one of the parties should not bar a determination of the property's intended and active status as a marital asset. The Appellate Division summarized this notion most clearly when, in the context of a "palimony" action, it recently stated: "The name in which the house was held is essentially irrelevant to an equitable action such as this."
Crowe v. DeGioia, 203 N.J. Super. 22, 34 (App.Div. 1985).
It would clearly strain all notions of fairness to permit defendant's request that the house be immune from equitable distribution, simply because he placed title in his name four days prior to the marriage and used his funds for the down payment. Such *387 a result would ignore the fact that plaintiff contributed over the years to the mortgage and maintenance expenses, and for fifteen years cleaned, cooked and raised a family in this house. She in effect performed all of the domestic services of the "traditional" homemaker. This Court finds that the Rutherford house was contemplated to be and did in fact become the marital residence, regardless of the name in which title was placed. Therefore, this Court holds that the stated premises constitute an asset of the marriage, subject to equitable distribution between the parties.
Judgment will be entered accordingly, and in further accordance with the full decision of this Court simultaneously rendered on all issues.