704 A.2d 913

PATRICIA A. HEUER, PLAINTIFF–APPELLANT, v. GILBERT J. HEUER, DEFENDANT–RESPONDENT.

Argued September 22, 1997—Decided January 8, 1998.

*Dale E. Console* argued the cause for appellant (*Ulrichsen, Amarel & Eory*, attorneys).

*James P. Yudes* argued the cause for respondent (*Mr. Yudes*, attorney; *Kevin M. Mazza*, on the brief).

The opinion of the Court was delivered by

COLEMAN, J.

The core question raised in this appeal is what legal effect a successful attack on the validity of an ancient foreign divorce or putative divorce should have on claims after remarriage for alimony and/or equitable distribution when the party procuring the putative foreign decree did not knowingly commit any wrongful conduct. The trial court held that (1) defendant was not estopped from attacking the validity of plaintiff's prior divorce, (2) defen-

dant was entitled to a judgment annulling his marriage with plaintiff, and (3) plaintiff's claims for alimony and equitable distribution must be dismissed.

We hold that under the totality of the circumstances, defendant is estopped from denying the validity of his marriage to plaintiff. Plaintiff is entitled to pursue her claims for alimony, equitable distribution, and marital torts.

## I

Because the case was disposed of in the trial court by an order granting partial summary judgment in favor of defendant, our statement of the facts is based on our consideration of the competent evidential materials presented in the light most favorable to plaintiff who opposed defendant's motion for summary judgment. *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 523–24, 666 *A.*2d 146 (1995).

Patricia (plaintiff) and Gilbert (defendant) Heuer were married in New Jersey in October 1984. It was the third marriage for each of them. In March 1995, plaintiff initiated these divorce proceedings in which the validity of plaintiff's first divorce became an issue.

Plaintiff and Kenneth McDougall were married on April 25, 1964 in Dover, New Jersey. They lived in Morris Plains, New Jersey until 1968 when they decided to seek a divorce. According to plaintiff, they decided to obtain a divorce in Alabama because they believed divorces to be lengthy, difficult, and costly in New Jersey and McDougall wanted to remarry quickly. In her deposition and supplemental interrogatories, plaintiff stated that an Alabama attorney sent forms that plaintiff and McDougall completed and had notarized at a Morristown bank. Plaintiff does not remember the name of the Alabama attorney, but she traveled to Alabama at the attorney's request. McDougall did not go with her. Plaintiff remained in Alabama for approximately thirty-six hours to fulfill the residency requirement she believed, based on the advice of counsel, was required to obtain a divorce in Alabama.

During her stay, plaintiff went to court and testified before a judge.

Plaintiff received a document called a "Divorce Decree" dated December 19, 1968. The document states that Patricia A. McDougall and Kenneth D. McDougall were divorced by the St. Clair County Alabama Circuit Court, and the decree was signed by Judge F.O. Whitten, Jr. McDougall signed a receipt acknowledging receipt of the judgment of divorce, and he subsequently remarried without knowledge that the judge had issued a fraudulent decree.

On May 16, 1970, plaintiff married Robert Williams in Madison, New Jersey. On the marriage license, plaintiff indicated that she had been married and divorced once before and that Kenneth McDougall was the name of her former husband. McDougall is listed as plaintiff's surname by a prior marriage on the record of her marriage to Williams from the State Registrar of Vital Statistics. Plaintiff testified at her depositions that she was required to produce the divorce decree from her first marriage before the license for her second marriage could be issued. During her marriage to Williams, plaintiff gave birth to a daughter. In 1982, plaintiff and Williams obtained a Judgment of Divorce from the Superior Court, Chancery Division, of Morris County.

Plaintiff and defendant were married in 1984. Their application for a marriage license indicates that plaintiff was married once before and lists her former husband as Robert Williams. The parties differ regarding whether, at the time of their marriage, defendant knew about plaintiff's marriage to McDougall. The trial court, however, was obligated to view that dispute in the light most favorable to plaintiff when considering defendant's motion for summary judgment. Plaintiff told defendant about her first marriage prior to dating him and she specifically remembers telling him that she went to Alabama to get her first divorce. Plaintiff also said that she and defendant discussed omitting the fact of her first marriage from the application because she was embarrassed about being twice divorced and her first marriage evoked painful memories. She stated that defendant did not have

a problem with the omission. Defendant denies that these conversations took place. Plaintiff's mother also said that she spoke with defendant about plaintiff's first marriage before they were married. Defendant denies that conversation occurred as well.

Defendant stated that the first time he became aware of plaintiff's first marriage and divorce was when he met McDougall at plaintiff's uncle's funeral in 1987, three years after plaintiff and defendant were married. Defendant claims that plaintiff informed him at that time of her marriage to McDougall, but that he did not inquire into the details of the first divorce because plaintiff told him it brought back painful memories. He did not seek to annul his marriage to plaintiff at that time. For purposes of the summary judgment motion, the trial court concluded that defendant knew about plaintiff's first marriage when he and plaintiff were married.

In March 1995, plaintiff filed a complaint seeking a divorce, alimony, and equitable distribution. She also filed two amended complaints in which she seeks, among other things, damages for an alleged marital tort. Defendant filed an Answer and Counterclaim, seeking an annulment on the grounds that plaintiff's first divorce was invalid. Defendant moved for summary judgment in June 1996. Although the trial court found that, for purposes of the motion, defendant knew about the Alabama divorce prior to marrying plaintiff, it granted the motion and annulled the marriage. The court refused to apply estoppel because defendant did not participate in the Alabama divorce proceedings.

The Appellate Division denied plaintiff's motion for leave to appeal the trial court's order. We granted plaintiff's motion for leave to appeal, 148 *N.J.* 456, 690 *A.*2d 604 (1997), and now reverse.

II

-A-

The historical context in which plaintiff sought the Alabama divorce is important. She sought a foreign divorce in 1968, which

was approximately three years before the New Jersey Legislature enacted our no-fault divorce law, the Divorce Reform Act of 1971, L.1971, *c.* 212, § 2. Our Divorce Act prior to the 1971 amendments restricted the dissolution of marriage to three postnuptial causes: adultery, willful desertion for at least two years, and extreme cruelty. *N.J.S.A.* 2A:34–2 to –3, since amended, *L.* 1971, *c.* 212, § 2, § 3; *L.* 1971, *c.* 217, § 11. The Divorce Reform Act of 1971 reduced the required time for desertion to one year, modified the nature of the proofs required, and added five additional grounds: eighteen months separation, voluntary habitual abuse of alcohol or any narcotic drug, twenty-four or more consecutive months of institutionalization for mental illness, imprisonment for eighteen or more consecutive months, and "[d]eviant sexual conduct voluntarily performed by the defendant without the consent of the plaintiff." *N.J.S.A.* 2A:34–2.

Plaintiff's statement that she sought an Alabama divorce because it was too difficult to readily obtain one in New Jersey is reflective of the strict legislative policy at the time. The policy was so strict that the Legislature directed that if an inhabitant of this State obtained a divorce or an annulment in another state or country based on a cause that occurred in New Jersey, or for a cause that was not cognizable in New Jersey, such a judgment would be accorded no force or effect in this State. *L.* 1948, *c.* 320, § 23, p. 1290–91; repealed by *L.* 1971, *c.* 212, § 9. That strict policy was implemented through our decisions. *Tonti v. Chadwick,* 1 *N.J.* 531, 535–36, 64 *A.*2d 436 (1949); *Warrender v. Warrender,* 79 *N.J.Super.* 114, 118, 190 *A.*2d 684 (App.Div.1963), *aff'd,* 42 *N.J.* 287, 200 *A.*2d 123 (1964); *State v. Najjar,* 1 *N.J.Super.* 208, 212–14, 63 *A.*2d 807 (App.Div.), *aff'd,* 2 *N.J.* 208, 66 *A.*2d 37 (1949). Thus, the type of foreign divorce that plaintiff thought she obtained prior to 1971 was deemed offensive to our public policy and statute at that time. Full faith and credit need not be accorded a judgment of another jurisdiction when the court issuing the judgment lacked the jurisdictional prerequisite of domicile. *Staedler v. Staedler,* 6 *N.J.* 380, 391–92, 78 *A.*2d 896 (1951); *Peff v.*

*Peff,* 2 *N.J.* 513, 521–22, 67 *A.2d* 161 (1949). Furthermore, only a putative judgment was obtained in Alabama. *Restatement (Second) of Conflict of Laws* §§ 102, 110 (1971).

Notwithstanding the legislative policy that predated the Divorce Reform Act of 1971, it would be "an overstatement to imply that courts even under prior laws were insensitive to equitable concerns or did not, within the constraints of the matrimonial statutes, conscientiously undertake to balance the equities as between parties." *Kazin v. Kazin,* 81 *N.J.* 85, 91, 405 *A.2d* 360 (1979). Although the Divorce Reform Act of 1971 has virtually eliminated the need for residents of New Jersey to seek foreign divorces, those amendments have not addressed the human and legal problems that would result if those ancient foreign divorces are found to be invalid many years later. Consequently, our decision in this case is informed by the liberalization of our laws governing the dissolution of marriage and equitable principles that have moved to the forefront in the last twenty-six years.

-B-

In the present case, it is virtually undisputed that plaintiff's first divorce was invalid independent of the domiciliary question. The Alabama judge who signed the divorce decree was later indicted for granting fraudulent divorces.[1] Furthermore, defendant produced a record of a search for the years 1960 through 1969 by the Alabama Department of Public Health, Center for Health Statistics, Office of Vital Records, which uncovered no record of divorce for Kenneth and Patricia McDougall. For those reasons, even if plaintiff had been properly domiciled in Alabama, the decree would be invalid. Indeed, plaintiff concedes, based on the scandals concerning divorces at the time she procured her divorce, she may have been the victim of fraud. She denies, however, that she

---

[1] In 1970, two Alabama judges, including Judge Whitten, were indicted for conspiracy and mail fraud in a "quickie divorce" scheme involving many New Jerseyans. *See 2 Judges, 7 Others Indicted in Dixie Divorce Racket,* Newark Star-Ledger, Aug. 21, 1970, at 1.

knowingly participated in a fraud. Assuming the trial court is correct in holding that the Alabama divorce was fraudulently issued, or that our now repealed nullifying statute was applicable to plaintiff's purported 1968 Alabama divorce, the real question is whether defendant should be estopped from denying the validity of his marriage to plaintiff.

-C-

Defendant argues that because there is no colorable divorce decree to challenge, plaintiff's estoppel argument must fail. Defendant maintains that estoppel does not apply because the cases that have applied estoppel were predicated on the fact that the estopped spouse either participated in obtaining the out-of-state divorce, or at least knew there was a prior divorce. Plaintiff contends that although defendant had knowledge of her prior divorces when they were married, such knowledge should not be a prerequisite to the application of estoppel. We agree with plaintiff.

Defendant's arguments implicate both the law of divorces and of annulments. We have recognized that

> irrespective of the factual context in which the issue may arise, the last of two or more marriages is presumptively valid. The presumption of validity may be overcome only by clear and convincing evidence that (1) there was a prior marriage, (2) the prior marriage was valid, and (3) the prior marriage was not terminated by death or divorce before the latest marriage.

> [*Newburgh v. Arrigo,* 88 *N.J.* 529, 538, 443 *A.2d* 1031 (1982).]

Defendant argues that his proofs clearly and convincingly demonstrate that the presumption of validity that attached to his marriage to plaintiff has been rebutted. Although we agree that defendant's evidence is sufficient to rebut the presumption of validity, that conclusion is not dispositive of whether he is entitled to a judgment of nullity.

*Newburgh* expressly recognized that the presumption of validity of a prior marriage and the doctrine of estoppel stem from a common source. As we said in *Newburgh:*

> The related presumption in favor of the validity of prior divorces is akin to estoppel to deny the validity of a prior divorce. *Kazin v. Kazin, supra,* 81 *N.J.* at 96 [405 *A.*2d 360]. Both principles recognize the reality of the increasing rate of divorce and remarriage. The law no longer insists on confining people in the grave of a dead marriage. *Id.* at 98 [405 *A.*2d 360]. Modern matrimonial law has relaxed the requirement for divorce and granted greater freedom to individuals in the pursuit of marital happiness.
>
> [*Newburgh, supra,* 88 *N.J.* at 538, 443 *A.*2d 1031.]

Justice Handler's concurring opinion in *Newburgh* expanded on that notion when he observed that "[f]airness and equity may demand that, after the passage of so many years and the absence of any showing of knowingly wrongful conduct on the procuring party's part, such long-settled matters should now be beyond attack." *Newburgh, supra,* 88 *N.J.* at 550–51, 443 *A.*2d 1031 (Handler, J., concurring). Principles of equity must be applied in light of the totality of the circumstances.

Annulment of marriages in this State is prescribed by the Legislature. The controlling statute, *N.J.S.A.* 2A:34–1, provides that marriages may be annulled when "[e]ither of the parties has another wife or husband living at the time of a second or other marriage." *N.J.S.A.* 2A:34–1a. Here, too, plaintiff relies on estoppel to preclude a judgment for annulment.

The social and legal problems caused by the so-called "quickie" foreign divorces are not new. Nearly half a century ago, this Court in *Tonti* held that although a wife's Mexican divorce from a previous spouse was void, the later husband was not entitled to challenge that divorce because he had known of the circumstances under which the divorce was procured. *Tonti, supra,* 1 *N.J.* at 536, 64 *A.*2d 436. Nevertheless, the Court denied the wife's claim for alimony and support because she failed to prove the validity of her present marriage. The results in that case were driven by legislative nullification of such extraterritorial divorces. After the Divorce Reform Act of 1971 was adopted, this Court rejected the underpinning for *Tonti* in *Kazin, supra,* 81 *N.J.* at 92, 405 *A.*2d 360. The decision in *Kazin* was substantially influenced by the fact that by that time the Legislature had essentially overruled *Tonti* because "[t]he previous statute negating foreign divorces

based on jurisdictional and substantive grounds inconsistent with our own ... [had been] repealed." *Ibid.*

The issue in *Kazin* was whether the plaintiff-wife, who had obtained an invalid Mexican divorce from her first husband, would be permitted to maintain an action against her second husband for divorce and alimony. Because the husband in *Kazin* was aware of the wife's prior marriage before they were married, and because he had participated in a meeting with the wife and her first husband and had traveled with the plaintiff as far as Texas on her way to Mexico to obtain the divorce, the Court held that he was estopped from denying the validity of their marriage. *Id.* at 98–99, 405 *A.*2d 360.

## -D-

■ Although the presumption of validity and estoppel are closely related, we decline to apply the presumption of validity standard in this case. Based on the special facts in this case, that approach does not adequately address the consequences of a successful, belated attack on an ancient foreign divorce decree such as the putative decree involved here. Since that putative decree was issued, there have been two marriages and the birth of at least one child. Plaintiff is entitled to a presumption that she would not willingly commit bigamy, a violation of *N.J.S.A.* 2A:92–1, repealed and replaced by *N.J.S.A.* 2C:24–1, or illegitimatize her children, *Sparks v. Ross,* 72 *N.J. Eq.* 762, 765, 65 *A.* 977 (Ch.Div. 1907), *aff'd,* 75 *N.J. Eq.* 550, 552, 73 *A.* 241 (E & A 1909). In a case such as this, claims for alimony and equitable distribution must of necessity be decided based on the facts and principles of equity. The standard for determining the legal effect of a successful attack on an ancient divorce should also be resolved by application of equitable principles that focus on the actual conduct of the parties. We believe that approach is conducive toward reaching the fair, sound, and correct disposition. Consequently, we adopt the equitable doctrine of estoppel to determine the legal

effect of a successful attack on an ancient divorce.  In all other respects, we reaffirm *Newburgh.*

Equitable estoppel has been defined as

... 'the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed ... as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse....'

[*Highway Trailer Co. v. Donna Motor Lines, Inc.,* 46 *N.J.* 442, 449, 217 *A.*2d 617, *cert. denied sub nom., Mount Vernon Fire Ins. Co. v. Highway Trailer Co.,* 385 *U.S.* 834, 87 *S.Ct.* 77, 17 *L.Ed.*2d 68 (1966) (quoting 3 *Pomeroy's Equity Jurisprudence* § 804 (5th ed.1941)).]

The doctrine is "designed to prevent a party's disavowal of previous conduct if such repudiation 'would not be responsive to the demands of justice and good conscience'."  *Carlsen v. Masters, Mates & Pilots Pension Plan Trust,* 80 *N.J.* 334, 339, 403 *A.*2d 880 (1979) (quoting *West Jersey Title, etc. Co. v. Industrial Trust Co.,* 27 *N.J.* 144, 153, 141 *A.*2d 782 (1958)).

There are two basic forms of estoppel.  "True estoppel" is used to define the situation in which " 'one party induces another to rely to his [or her] damage upon certain representations.' "  *Kazin, supra,* 81 *N.J.* at 94, 405 *A.*2d 360 (quoting *Restatement (Second) of Conflict of Laws* § 74, cmt. b (1971)).  "Quasi-estoppel" describes a situation in which "an individual is not permitted to 'blow both hot and cold,' taking a position inconsistent with prior conduct, if this would injure another, regardless of whether that person has actually relied thereon."  *Ibid.* (quoting *Brown v. Brown,* 274 *Cal.App.*2d 178, 82 *Cal.Rptr.* 238, 244–45 (1969)).

The *Restatement (Second) of Conflict of Laws* § 74 (1971), relied on by this Court in *Kazin,* is helpful in deciding when to invoke the doctrine.  It provides: "A person may be precluded from attacking the validity of a foreign divorce decree if, under the circumstances, it would be inequitable for him to do so."  One of the comments to that rule explains that "[s]uch inequity may exist when action has been taken in reliance on the divorce or expecta-

tions are based on it or when the attack on the divorce is inconsistent with the earlier conduct of the attacking party." *Id.* at cmt. b. Thus, the Restatement embraces both "true estoppel" and "quasi-estoppel."

■ "Estoppel may arise by silence or omission where one is under a duty to speak or act." *Carlsen, supra,* 80 *N.J.* at 341, 403 *A.*2d 880. The party seeking to invoke the doctrine has the burden of proving that the other party should be estopped. *Newburgh, supra,* 88 *N.J.* at 541, 443 *A.*2d 1031; *Lawes v. Lynch,* 7 *N.J.Super.* 584, 593, 72 *A.*2d 414 (Ch.Div.), *aff'd,* 6 *N.J.* 1, 76 *A.*2d 885 (1950).

■ In the field of matrimonial jurisprudence, the doctrine of unclean hands may be considered simultaneously with estoppel to help ensure justice and to protect the integrity of the courts. *Untermann v. Untermann,* 19 *N.J.* 507, 517, 117 *A.*2d 599 (1955). The equitable maxim "[a party] who comes into equity must be with clean hands" has limitations.

> It does not repel all sinners from courts of equity, nor does it apply to every unconscientious act or inequitable conduct on the part of the complainants. The inequity which deprives a suitor of a right to justice in a court of equity is not general iniquitous conduct unconnected with the act of the defendant which the complaining party states as his ground or cause of action; but it must be evil practice or wrong conduct in the particular matter or transaction in respect to which judicial protection or redress is sought.
>
> [*Neubeck v. Neubeck,* 94 *N.J.Eq.* 167, 170, 119 *A.* 26 (E & A 1922).]

■ That maxim is discretionary on the part of a court. "It is the effect of the inequitable conduct on the total transaction which is determinative whether the maxim shall or shall not be applied." *Untermann, supra,* 19 *N.J.* at 518, 117 *A.*2d 599. "Equities arise and stem from facts which call for relief from the strict legal effects of given situations." *Ibid.* The record in this case discloses no basis to apply the maxim to plaintiff. She acted in good faith when she sought an Alabama divorce, when she married defendant, and when she consented to his adoption of her daughter.

## III

Traditionally, we have permitted estoppel to be applied successfully in three types of matrimonial cases: (1) to preclude spouses from attacking their own prior divorces; (2) to preclude a party who took an active role in assisting a spouse to obtain an invalid divorce from attacking it; and (3) to preclude a spouse who had a "relatively passive" role in obtaining the divorce, but who relied on the divorce in marrying, from invoking its invalidity. *Kazin, supra,* 81 *N.J.* at 95, 405 *A.*2d 360. A fourth category, the quasi-estoppel which we apply to this case, was also acknowledged in *Kazin. Id.* at 94, 405 *A.*2d 360.

■ Defendant's assertion that his marriage to plaintiff is invalid is totally inconsistent with cohabiting together as husband and wife for an extended period. He seeks to injure plaintiff by depriving her of alimony and equitable distribution under the statutory scheme set forth at *N.J.S.A.* 2A:34–23. As the Court observed in *Newburgh,* "[u]nder certain circumstances, one who enters into and accepts the benefits of a marriage may be equitably estopped" from later denying its validity. *Newburgh, supra,* 88 *N.J.* at 539, 443 *A.*2d 1031. This is a case in which quasi-estoppel applies, and it does not require proof that defendant somehow participated in the Alabama proceedings.

The trial court accepted, as it was obligated to do, that defendant was aware of plaintiff's divorce from Kenneth McDougall at the time of their marriage in 1984. Plaintiff and defendant participated in a ceremonial marriage and cohabited together until December 1994, according to plaintiff. They built a house together, and defendant adopted plaintiff's daughter from her second marriage in 1993, some seven years after he learned of the Alabama divorce in 1987. At no time did defendant either suggest that plaintiff should take any additional action respecting the putative Alabama divorce, or seek to legally attack his marriage to plaintiff prior to filing an answer and counterclaim to plaintiff's complaint in 1995. He continued in the relationship as husband and wife for over seven years after, by his own admission, he knew

about the Alabama proceedings without questioning the validity of the putative Alabama divorce. "Matrimonial suits ... ought not be permitted to take on the aspects of a game wherein wits ... and finesse prevail over elemental right and justice." *Shepherd v. Ward,* 5 *N.J.* 92, 111, 74 *A.*2d 279 (1950). Thus, in the eyes of the world, they were husband and wife financially, socially, and legally for purposes of alimony, equitable distribution, and marital torts.

The attack on the validity of the marriage is for the sole purpose of avoiding alimony and equitable distribution under *N.J.S.A.* 2A:34–23 and decisional law interpreting that statute. In other words, defendant seeks to use the invalidity of the putative Alabama decree to injure plaintiff financially. His current position is inconsistent with his prior indifference while holding himself out to the world as plaintiff's husband. Under principles of quasi-estoppel, defendant cannot be permitted to blow both hot and cold. *Raspa v. Raspa,* 207 *N.J.Super.* 371, 381, 504 *A.*2d 683 (Ch.Div.1985). There is no evidential material showing that plaintiff was anything but a victim of fraud in the Alabama proceedings. She retained the services of an Alabama attorney,[2] and she gave sworn testimony before a judge in Alabama in what appeared to her to have been a courtroom.

Under quasi-estoppel principles, a party who did not know of a spouse's prior marriage and divorce, or one who knew about it but played no role in obtaining the prior divorce, may nonetheless be estopped from denying the validity of a current marriage. Defendant, however, knew at least within three years of the marriage, if not sooner.

Factors to be considered when determining whether quasi-estoppel has been satisfied are: (1) the length of time the parties were married, (2) the acts undertaken by the parties that

---

[2] The record does not inform us whether plaintiff consulted a New Jersey attorney who referred her to an attorney in Alabama. Such a referral would not have violated the Canons of Professional Ethics. *In re Feltman,* 51 *N.J.* 27, 28–29, 237 *A.*2d 473 (1968); *Nappe v. Nappe,* 20 *N.J.* 337, 346, 120 *A.*2d 31 (1956).

indicate they held themselves out as husband and wife, and (3) the good faith of the party who procured the first divorce. Here, the parties had been married for twelve years before the validity of the marriage was challenged, and only then was it challenged in defense to plaintiff's divorce complaint. They held themselves out to the public as husband and wife for at least eleven years preceding the filing of the complaint. Plaintiff was financially dependent on defendant. They lived together in a house that was apparently built after cohabitation began, and they ran a horse farm together. Defendant even adopted plaintiff's twenty-one-year old daughter in 1993 after she had resided with him for more than ten years. As noted earlier, plaintiff acted in good faith when she obtained the putative divorce in Alabama. Consideration of the evidential materials in this case, therefore, leads to the conclusion that defendant should be estopped from challenging plaintiff's divorce. *Brill, supra,* 142 *N.J.* at 533–36, 666 *A.2d* 146.

Courts in other jurisdictions have similarly precluded spouses from obtaining annulments by invoking invalid divorces they did not help to procure and did not know were defective at the time of their marriage. *See Poor v. Poor,* 381 *Mass.* 392, 409 *N.E.2d* 758 (1980); *Zirkalos v. Zirkalos,* 326 *Mich.* 420, 40 *N.W.2d* 313 (1949); *Lowenschuss v. Lowenschuss,* 396 *Pa.Super.* 531, 579 *A.2d* 377, *appeal denied,* 527 *Pa.* 611, 590 *A.2d* 297 (1991). Those decisions support our disposition that a spouse may not annul a marriage by invoking an invalid foreign divorce after becoming aware of that foreign divorce and yet continuing to live together as husband and wife for a number of years. Defendant cannot be allowed to disavow his actions over eleven years if he knew about the Alabama proceedings when he married plaintiff, or for the eight to nine years beginning in 1987. Either period satisfies the standard we here articulate.

Other considerations counsel against granting an annulment here as well. By attacking plaintiff's first divorce, defendant is also calling into question the validity of plaintiff's second marriage during which a daughter was born. Plaintiff's first husband has

also remarried and has children. If defendant's marriage to plaintiff were annulled, that could invalidate her second marriage if challenged. We find no compelling reason to suggest that those relationships should be called into question.

Given the liberal changes in our divorce law after plaintiff obtained the putative Alabama decree in 1968, we foresee that our decision will have a very limited impact. A contrary decision, however, could have an unsettling influence on people relying on ancient foreign divorces. Such a result would be both unjust and unwarranted. The equity jurisdiction of our courts should be exercised to do justice, not to create injustice. Furthermore, our decision will hopefully preserve family relations, which are still essential to the fabric of our society.

We hold that based on the undisputed facts that are central to our decision, defendant is estopped from denying the validity of his marriage to plaintiff. The dismissed portion of the complaint as amended is reinstated, and the matter is remanded to the trial court to proceed with a disposition on the merits of the claims for divorce, equitable distribution, alimony, and the marital torts.

The judgment of the trial court is reversed, and the matter is remanded for disposition that is consistent with this opinion.

*For reversal and remandment*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.