845 A.2d 646 (2004)
368 N.J. Super. 116
MESSEKA SHEET METAL CO., INC., Plaintiff-Appellant,
v.
Terry Hodder and Lori A. HODDER, his wife, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Submitted January 28, 2004.
Decided April 1, 2004.
*647 Joseph R. Bulman, East Brunswick, attorney for appellant.
Mark R. Silber, Metuchen, attorney for respondents.
Before Judges KING, LINTNER and S.L. REISNER.
The opinion of the court was delivered by KING, P.J.A.D.
This case involves an air conditioning subcontractor's complaint that Sayreville homeowners Terry and Lisa Hodder (Hodder) did not pay in full for the installation of two air conditioning units. The work involved the reconstruction of a rehabilitated house, which had been totally gutted to a shell by a general contractor working with various subcontractors. This case implicates concerns about the Consumer Fraud Act, N.J.S.A. 56:8-1 to 8-106(CFA), its policies, and basic fairness. We find the CFA inapplicable in the circumstances to the plaintiff subcontractor and reverse the judgment of the trial judge in the owner's favor.

I
On August 15, 2001 Messeka Sheet Metal Co., Inc. (Messeka), the air conditioning subcontractor, filed a complaint alleging Hodder was responsible for a balance of $3000 plus interest on a contract for the installation of two air conditioning units. Messeka attached to the complaint a copy of an invoice it had presented to Hodder in May 2001. The invoice stated Messeka's demand for payment from Hodder for the sale and installation of a two-zone (first and second floor) air conditioning system. The total price was $11,000. The invoice shows that Hodder had made a $5,000 payment in November 2000 and a $3,000 payment in March 2001, leaving a balance of $3,000the subject of this suit. The invoice was identical in substance to the written quotation Messeka had furnished in August 2000 to John Rupp, the general contractor, at Rupp's request. Rupp accepted the $11,000 quotation and directed Messeka to proceed with the work. Hodder denied Messeka's allegations, and asserted, as an affirmative defense and counterclaim, that Messeka had violated the CFA, specifically certain implementing regulations. These regulations, at N.J.A.C. 13:45A-16.2, are set out in pertinent part in Appendix A to this opinion.
*648 Hodder claimed Messeka violated the CFA and regulations because it:
a. failed to obtain a building permit [N.J.A.C. 13:45A-16.2(10.i.) and 13:45A-16.2(10.ii.)];
b. failed to obtain the required municipal inspections [N.J.A.C. 13:45A-16.2(10.i.) and 13:45-16.2(10.ii.)];
c. failed to obtain and deliver to defendants final compliance certification from the local government prior to demanding and suing for payment [N.J.A.C. 13:45A-16.2(10.i.) and 13:45A-16.2(10.ii.)];
d. failed to furnish the buyers with a written copy of all guarantees and/or warranties [N.J.A.C. 13:45A-16.2(11.i.)];
e. failed to provide defendants with copies of all guarantees and/or warranties prior to commencing work [N.J.A.C. 13:45A-16.2(11.i.)];
f. failed to obtain a signed, written contract, legibly, clearly, and, accurately setting forth all terms and conditions of the contract, including plaintiff's legal name, business address, and, the name and business address of the specific person negotiating the contract [N.J.A.C. 13:45A-16.2(12)];
g. failed to provide a written description of the work with the products and materials [N.J.A.C. 13:45A-16.2(12)];
h. failed to provide in writing the total price to be paid [N.J.A.C. 13:45A-16.2(12)];
i. failed to provide in writing the start and finish date of the work or project [N.J.A.C. 13:45A-16.2(12)]; and
j. did, in fact, make a claim for payment and claim a contract existed where no final, written agreement, in fact, existed [N.J.A.C. 13:45A-16.2(12)];
k. did misrepresent to the defendants that the initial down-payment was the full amount that defendants would be obligated to pay [N.J.A.C. 13:45A-16.2(6.vii.)]; and,
l. did misrepresent that the machinery and materials plaintiff was installing were of sufficient size, capacity, character, and, nature to perform the job expected [N.J.A.C. 13:45A 16.2(2.vii.)].
Messeka answered the counterclaim, denying that it had any legal obligation under the CFA, and it asserted various affirmative defenses, including estoppel, waiver, and laches.
The case proceeded to a nonjury trial on June 17, 2002. After the completion of Messeka's case, Hodder moved for a directed verdict, which the judge denied. However, the judge found that the CFA applied to Messeka, and, as a consequence, ruled Messeka could only recover in quantum meruit, not for the contract price.
The trial ended after a second day. The judge issued a written opinion on July 22, 2002 and entered a final judgment. The judge said in his written opinion:
First, it is clear from the plaintiff's own testimony that there have been violations of the [CFA] and of the Administrative Rules set forth in [N.J.A.C. 13:45A-16.2, paragraphs 11.i. and 12.i, ii, iv]. Because of these violations, plaintiff cannot recover on the book account, and will be limited to its claim for quantum meruit.
There is uncontroverted testimony on the part of George Messeka that the labor and equipment for the job in question cost the plaintiff $8,225.51, and that plaintiff's profit, if it were to be paid the full amount it seeks, would be $1,800. The only testimony before the court as to the value of the work performed and the goods provided was that of plaintiff, *649 who, not surprisingly, testified that the value was $11,000.00, the amount on the original "quotation" (P-1 in evidence). This would mean that all of plaintiff's costs totaled $9,200.00, though they have not accounted for the difference of $944.49.
I find that because of plaintiff's statutory violations, they are entitled to recover only the cost to them of the labor and equipment, namely, $8,255,51. However, they have already been paid $8,000.00; therefore, judgment will be entered on the complaint in favor of the plaintiff in the amount of $255.51. With regard to plaintiff's claim of $150.00 for "extra work" on the stove vent, this would not have violated the CFA, because the price did not exceed $200.00. However, there was no testimony whatsoever that plaintiff ever made a demand for this sum; therefore, plaintiff's claim for this amount fails.

With regard to the counterclaim, there has been no proof of any damages incurred by the counterclaimants as a result of plaintiff's violation of the statute. There wasn't even testimony as to what they paid to have the system started up. Therefore, there will be no damages awarded on the counterclaim. Counterclaimants are, however, entitled to an award of reasonable attorney fees. [See N.J.S.A. 58:8-19.]
[Emphasis supplied.]
Messeka filed a motion for reconsideration which the judge ruled upon in an oral opinion. In this opinion, the judge again stated that the CFA applied to Messeka. He also said:
With regard to the opinion from the Court of July 22nd, I have revisited my thinking and I have decided to adjust the judgment up to $1200, adding back to the 255.51 the 944.49 referred to on the second page of the opinion.
With regard to the issue of attorney's fees, I find that contrary to [Messeka's counsel] Mr. Bulman's very capable arguments, this is the classic case. Had there been no fee shifting provision to the Consumer Fraud Act these people could probably not have found an attorney to represent them on a relatively small matter. They would not have prevailed. They might not have even answered, that I don't really know. The plaintiff would've just steamrolled them into a $3,000 judgment. I find that the homeowner's counsel was quite successful in this matter and is entitled to the fee sought and granted in the original application.
The judge then awarded Messeka $1200, an increase from the initial August 2002 judgment which directed Messeka receive only $255.51. The judge also required Messeka to pay Hodder $4,188 in counsel fees under the CFA. See N.J.S.A. 56:8-19. Messeka lost out on the profit, the remaining $1800 of the $3000 which the complaint demanded less the $1200 which the judge awarded.

II
The subcontractor Messeka urges on this appeal that the judge erred in applying the CFA to this transaction, an air conditioning installation on a totally gutted and rehabilitated house where the job was undertaken by a general contractor hired by the owner and where the owner was also represented by a hired architect. Messeka asserts that its project was beyond the scope and statutory purpose of the CFA. We agree.
The Department of Law and Public Safety has adopted administrative regulations to ensure compliance with the CFA. See N.J.A.C. 13:45A-1.1 to -28.8. These regulations concern various commercial enterprises, including, for example, the retail *650 sale of meat, N.J.A.C. 13:45A-3.1 to -3.15, the delivery of household furniture and furnishings, N.J.A.C. 13:45A-5.1 to -5.4, the servicing and repairing of home appliances, N.J.A.C. 13:45A-10.1 to -10.5, and automotive sales practices, N.J.A.C. 13:45A-26B.1 to -26B.2.
One section of these regulations, quoted in pertinent part in Appendix A, is devoted to "Home Improvement Practices." N.J.A.C. 13:45A-16.1 to -16.2. N.J.A.C. 13:45A-16.1 defines "home improvement" as:
the remodeling, altering, painting, repairing, or modernizing of residential or noncommercial property or the making of additions thereto, and includes, but is not limited to, the construction, installation, replacement, improvement, or repair of driveways, sidewalks, swimming pools, terraces, patios, landscaping, fences, porches, windows, doors, cabinets, kitchens, bathrooms, garages, basements and basement waterproofing, fire protection devices, security protection devices, central heating and air conditioning equipment, water softeners, heaters, and purifiers, solar heating or water systems, insulation installation, aluminum siding, wall-to-wall carpeting or attached or inlaid floor coverings, and other changes, repairs, or improvements made in or on, attached to or forming a part of the residential or noncommercial property, but does not include the construction of a new residence. The term extends to the conversion of existing commercial structures into residential or noncommercial property and includes any of the above activities performed under emergency conditions.
[Emphasis supplied.]
The trial judge interpreted this language of N.J.A.C. 13:45A-16.1 to apply to this transaction, the installation of two air conditioning units by Messeka, the subcontractor, per his quotation to John Rupp, the general contractor.
Messeka argues that the CFA does not apply because the installation was part of "the construction of a new residence." The judge correctly observed that there were no cases specifically "interpreting whether the exclusion applies to a house previously built and sold, but which has been taken down to the outside walls." To determine the CFA's applicability in these circumstances, we find it necessary to consider the testimony in greater detail.
The installation of air conditioning at the Hodders' home was one part of a major renovation of the house. The operation included: (1) an architectural firm, Quackenbush Architects, representing the owner; (2) the general contractor hired by the owner; and (3) several other subcontractors. George Messeka, a principal of the Messeka company, explained this on direct examination:
Q. Okay. What were the circumstances that led up to the defendants hiring your company to do that air conditioning work at their home in or about August of 2000?
A. Well, we started [when] John Rupp gave us a set of plans to
Q. Excuse me. Who is John Rupp?
A. John Rupp is a general contractor.
Q. Was he the defendant's general contractor?
A. Yes, he was.
Q. I'm sorry. Continue.
A. He gave us a set of plans to figure for heating and air conditioning. We did and later on during that summer of 2000 we were told that he's going to put hot water system in, that just figure for the air conditioning which we re-figured the job and gave him the quotation and that was about JulyI think July or August, I'm not sure of the date. And *651 we gave that to John and we started the job shortly after.
Q. Okay. Now, was the work that the plaintiff was hired to perform at the defendant's home, was that part of a larger project that the defendants had ongoing at their home at 24 Roma Street in Sayreville?
A. Yes, it was.
Q. Can you please describe for the Court the nature and extent of the defendant's project.
A. Well, it's basically new construction. Everything was done from scratch.
Q. Now, when you say it was new construction, are you referring to their entire house?
A. The entire house.
Q. And at what stage of the work on the defendant's projectwhat stage of that work had been reached at the time the plaintiff started its work on the project?
A. Well, the house was basicallyjust the walls were standing.
Q. Okay.
THE COURT: You said basicallywhat did you just say? I'm sorry. The house was basically
THE WITNESS: Just the walls were standing there. There was nothing inside.
Messeka later agreed on cross-examination it was his belief that "this house was taken down to the exterior masonry walls and then gutted and rebuilt."
John Rupp, the general contractor, testified and explained:
Q. Okay. And could you describe for the Court please the nature and extent of Mr. and Mrs. Hodder's project, the project where your company served as a general contractor on?
A. Pretty much a total redo. Took everything completely apart, and renovated everything, changed everything around and put it all back together. It was a total redo.
Q. Okay. Now, in your experience as a contractor, have you been involved in projects that have been, you know, what I call home repair or home improvement projects?
A. Yes.
Q. Now, was the Hodder's project a home improvement or home repair project or was it more than that?
A. It was much more than that.
Q. Okay. Would you say that it amounted to a total reconstruction of their house?
A. Yes, it was.
Q. And did eitherwell, did your company have a written contract with the defendants as general contractor for the project?
A. No, it was time [and] material basis.
Rupp said Messeka came to install the air conditioning system at Rupp's direction when "[t]he house was gutted and all the framing was reframed and reconfigured and that's when they started at that point."
Greg Messeka, who worked with his father and was a helper on the Hodder project, said "[t]he house was a total renovation. There were [beam] replacements, main supports were moved. The whole house was gutted. Everything in it was new as though it were a brand new house." Sheetrock was removed, as was insulation.
This testimony certainly gives the impression that the Hodder project was a major overhaul, as shown by the hiring of an architect and general contractor, the stripping of the house down to its masonry shell and foundation, and the relocation of structural supports. The evidence strongly *652 suggests that the builders and the Hodders approached the project as if they were building a practically new house, with the exterior walls and foundation already in place.
Concluding that the CFA applied, the trial judge stated:
.... [T]here are no cases specifically on point, in interpreting whether the exclusion applies to a house previously built and sold, but which has been taken down to the outside walls. I find that this case does not fall within the [new residence] exception [of N.J.A.C. 13:45A-16.1].
The judge quite correctly saw the case as one of first impression. He found unhelpful Licciardi v. Pascarella, 194 N.J.Super. 381, 476 A.2d 1273 (Law Div.1983); he found certain federal regulations inapplicable.
The trial judge reasoned that since the exterior shell of the Hodder house still remained, the CFA applied. While we realize that the CFA is extremely important to the protection of consumers against fraudulent practices of home improvement contractors, we conclude that basic fairness, efficiency, and practical realities of residential construction and rehabilitation require us to take an alternative view in this contractual context.
Messeka relies upon Licciardi and Foti v. Heller, 48 N.J.Super. 57, 137 A. 2d 10 (App.Div.1957), to support his claim that the CFA should not apply to the Hodder project. Licciardi is inapposite; it concerned the duties and warranties of a house reseller to a homebuyer. Neither is Foti helpful; it concerned the definition of "new rental space" for purposes of rent control laws. But there are other reasons we think this project falls outside the CFA and the purpose of the "home improvement" regulations.
In this situation the owner engaged the services of an architect to prepare plans and a general contractor, who hired Messeka, the HVAC subcontractor. In this situation the plaintiff Messeka was not, in our view, a traditional "seller" within the customary understanding of the CFA's regulations. See N.J.A.C. 13:45A-16.2(a).[1] The regulations are designed to protect homeowners who deal directly with contractors. Here, the owner, Hodder, dealt with a general contractor, Rupp, and hired an architect, Quackenbush. Messeka was engaged by Rupp to install the two-level air conditioning unit. Initially, Messeka dealt only with the general contractor. Later, upon Rupp's suggestion and with Hodder's agreement, Messeka dealt directly with Hodder in an effort to collect the $3000 balance on his $11,000 invoice, the subject of this suit. The first $8000 was paid in the regular course without any quibble. As noted, this situation was very similar to the construction of a new homethe existing house was gutted down to the masonary shell and the foundation and a new second-level was added.
But rather than rest our decision on the "new residence" exception to the "home improvement" definition, N.J.A.C. 13:45A-16.1, we are persuaded that this case falls beyond the purpose of the regulations because the owner hired his own general contractor and architect to run the job. This is not the typical "home improvement" situation, where the owner deals *653 with the contractor directly. To apply all of the regulatory requirements to each individual subcontractor in this type of situation would be inefficient and duplicative. Every contractor would need to have a contract in writing directly with the owner and secure municipal licenses and approvals for the job. The owner would have to deal directly with everyone on the job, not a common-sense approach. In this case Rupp, the general contractor, secured all municipal permits and approvals and obtained the certificate of occupancy. Interestingly, he had no written agreement with Hodder, whom Rupp knew personally; Hodder had worked for Rupp for a few months in the past. If anybody violated the "home improvement" regulations, it was Rupp, the general contractor. Messeka also had filled out pertinent forms and assisted the Hodders in obtaining the $1100 energy rebate on the air conditioning units. And, as the judge found, "there was no proof of any damages incurred by the [Hodders] as a result of plaintiff's violation of the statute," and no proof of faulty work or defective equipment.
Our position here comports both factually and legally with a similar case, from a sister jurisdiction on the question of whether a state's home improvement contract law applies to subcontractors.[2] In Meadows v. Higgins, 249 Conn. 155, 733 A.2d 172 (1999), the Connecticut Supreme Court held that the State's Home Improvement Act, C.G.S.A. §§ 20-418 to 20-432, which resembles New Jersey's regulatory scheme administratively, does not apply to subcontractors. Meadows has striking similarities to the present situation. A homeowner contracted with a construction consultant to perform renovations on an existing house. The consultant retained a painter-wallpaperer to perform work on the house. After the painter-wallpaperer had completed 90-95% of the work, the owner ordered him to leave the premises. The painter sued for services rendered. The owner argued the painter had violated the Home Improvement Act because there was no written contract. The owners sought compensatory and punitive damages, attorneys fees, and interest under the statute. 733 A.2d at 174.
The Connecticut Supreme Court affirmed the principle stated in O'Donnell v. Rindfleisch, 13 Conn.App. 194, 535 A.2d 824, cert. denied, 207 Conn. 805, 540 A.2d 373 (1988), that subcontractors were not subject to the Home Improvement Act. 733 A.2d at 177. O'Donnell concerned whether a roofer retained by a contractor was subject to the Home Improvement Act. Even though the construction in that case was on an existing house and only upon the roof, the court found, after extensive statutory analysis, that the Home Improvement Act did not apply to subcontractors. The Home Improvement Act's aim "was targeted only at contractors who deal directly with property owners." 535 A.2d at 828. The court said:
The contract between the contractor and the subcontractor is not within the purview of the Act, and need not be under *654 its purpose and premise, for by its terms the contractor is responsible to the consumer and the commissioner of consumer protection for whatever the subcontractor may do. The level of the Act's protection does not reach the contractor in his relationship with a subcontractor. In such a business relationship, the contractor is not a consumer. It is clear from the legislative record that the registered contractor was intended to be the person liable for the actions of persons he hires, employs or engages as a subcontractor to work on a homeowner's improvement project.

[O'Donnell, 535 A.2d at 828]
The Connecticut Supreme Court agreed "with the trial court that requiring subcontractors to register as home improvement contractors would be unreasonable and unduly burdensome in an industry where most, if not all, construction work is often subcontracted for its completion by a general contractor who oversees the entire project and is responsible for the final result." Ibid.
The case before us presents a situation somewhat similar to D'Egidio Landscaping v. Apicella, 337 N.J.Super. 252, 766 A.2d 1164 (App.Div.2001). There, the defendant, a homeowner, hired the plaintiff, a landscaping company, to pave a driveway and remove a manhole on the defendant's property. Because the homeowner, Apicella, was related by marriage to the landscaping company's principal, D'Egidio, and because D'Egidio and Apicella, a painter, had done work for each other through the years, Apicella refused to sign the contract which D'Egidio had prepared for the project. Apicella was "insulted" at the idea. 337 N.J.Super. at 255-56, 766 A.2d 1164.
In the end, Apicella was unhappy with the work, the landscaping company sued for payment, and Apicella counterclaimed for damages. The issue arose as to the CFA's applicability. The trial judge attempted to carve out a "family exception" to the CFA's applicability, which we rejected conceptually. 337 N.J.Super. at 256-57, 766 A.2d 1164. Nevertheless, in upholding the result, Judge Wefing stated:
We are satisfied, nonetheless, that defendant is not entitled to the protections offered by the [CFA] and the regulation because it was his own conduct which caused the violation. Were we to conclude that defendant is entitled to invoke N.J.A.C. 13:45A-16.2(12), the result would be to permit defendant to retain, at no cost, the fruits of D'Egidio's labor when he was the one who insisted a written contract was unnecessary in light of their [long-standing] relationship. It would also reward defendant with the remedial provisions of the consumer fraud statute. We consider such a result unacceptable; one who induces the alleged wrongdoing should not benefit as a result of it. See, Sears Mtge. Corp. v. Rose, 134 N.J. 326, 346, 634 A.2d 74 (1993)[,] where the Court, in holding the buyer's title insurance company liable for acts of the buyer's attorney who absconded with the closing proceeds, noted that it "was in a position either to prevent or protect against the loss...." Not only did Apicella not "prevent or protect against the loss," he occasioned it.

[337 N.J.Super. at 257, 766 A.2d 1164.]
We also concluded the case was appropriate for application of equitable estoppel. We said:
Equitable estoppel has been defined as "the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed ... as against another person, who has in good faith relied *655 upon such conduct, and has been led thereby to change his position for the worse ..." The doctrine is "designed to prevent a party's disavowal of previous conduct if such repudiation `would not be responsive to the demands of justice and good conscience'".
[D'Edigio Landscaping, 337 N.J.Super. at 258, 766 A.2d 1164 (quoting Heuer v. Heuer, 152 N.J. 226, 237, 704 A.2d 913 (1998) (citations omitted))]
We found no reported authority applying equitable estoppel to the CFA, but were "unable to perceive any reason in logic or policy which would lead to a conclusion that equitable estoppel is inapplicable." D'Edigio Landscaping, 337 N.J.Super. at 258, 766 A.2d 1164. We concluded:
We recognize New Jersey's long-standing commitment to the protection of the consumer. We are fully cognizant of the fact that the consumer fraud statute is remedial legislation and should be liberally construed to accomplish its dual objectives of deterrence and protection. Lettenmaier v. Lube Connection, Inc., 162 N.J. 134, 139, 741 A.2d 591 (1999); Cox v. Sears Roebuck & Co., [138 N.J. 2], 15, 647 A.2d 454.
We are satisfied, however, that in the unique circumstances presented here, we are not retreating from that commitment or weakening the scope of the statute's protective reach when we apply the doctrine of estoppel. Defendant is, as the trial court noted, in the home improvement business himself as a painter and as chargeable for knowing the applicable regulations as plaintiff. "The consumer fraud statute is aimed at promoting truth and fair dealing in the market place." Feinberg v. Red Bank Volvo, Inc., 331 N.J.Super. 506, 512, 752 A.2d 720 (App.Div.2000). Permitting this defendant in the context of this case to invoke the statutory remedies afforded by the Consumer Fraud Act would not further those laudable legislative objectives.

[Id. at 258-59, 766 A.2d 1164.]
We think that these principles point to a similar result here. Most pertinent to our inquiry is that Hodder sought out a general contractor and architect. He did not have a direct contract with the HVAC subcontractor, Messeka. (The record is unclear but Hodder may have dealt directly with a plumber and a masonry subcontractor.) By proceeding in this fashion, Hodder left it to the general contractor to make the choices as to who would perform this portion of the project. It would not likely occur to a subcontractor that it had any direct obligation to Hodder, since its engagement was with Rupp. If anyone would be responsible as a home improvement contractor under the CFA to the owner, we presume his own general contractor would be. Messeka dealt directly with Hodder for payment only, at Rupp's request, when a price dispute arose, after the work had been completed and $8000 of $11,000 had been paid, as we understand this record.
Branigan v. Level on the Level, Inc., 326 N.J.Super. 24, 740 A.2d 643 (App.Div.1999), also presents a thoughtful case against applying the CFA's strictures too mechanistically and technically to Messeka. Branigan involved a project larger than in D'Egidio Landscaping and closer to the scale of Hodder's. Judge Ciancia described the renovations this way:
Plaintiffs had contracted with defendant Level on the Level, Inc., through its president, David Marlinski, for an extensive home improvement project designed to renovate portions of plaintiffs' existing Victorian home and add significant additional living space. Plaintiff John Branigan, a graphic designer by profession, spent three years developing the design plans and specifications for the *656 project. When the project went out to bid, the specifications encompassed twenty-four pages of detailed requirements. Marlinski's company was the successful bidder, and the contract entered between the parties specifically incorporated the drawings and specifications prepared by Branigan as well as the bid proposal submitted by Level on the Level, Inc.
[Branigan, 326 N.J.Super. at 27, 740 A.2d 643.]
After construction, Branigan sued "Level on the Level" because of problems with the heating system and water in the basement under certain conditions. Branigan's claims were based on breach of contract, negligence, breach of warranty, and violations of the CFA.
After the close of plaintiff's case, defendants moved successfully for an involuntary dismissal. The trial judge attributed Branigan's problems mainly to his attempt to "cover all the bases and retain control over primary decisions." 326 N.J.Super. at 28, 740 A.2d 643. Branigan did not want a separate furnace for the new addition, which led to the heating problems, and because there had been no prior water problems, he did not want the installation of water removal devices. Ibid.
We were "thoroughly convinced, as was [the trial judge], that viewing the proofs most favorably to plaintiffs, there was no evidence to permit a jury to find defendants had done or failed to do anything that could be considered negligent, a breach of contract, a breach of warranty, or a violation of the Consumer Fraud Act." 326 N.J.Super. at 28, 740 A.2d 643. Still, we recognized "there is more to the [CFA] than acts of commission or knowing acts of omission," 326 N.J.Super. at 28, 740 A.2d 643, because a contractor could violate the CFA by violating the regulations. Ibid. See Alloway v. Bradlees, Inc., 157 N.J. 221, 236, 723 A.2d 960 (1999) (OSHA violations a basis for a common-law negligence action).
We addressed Branigan's contention that his contract with "Level on the Level" violated the CFA's regulations. Branigan said, for instance, that the contract contained a "failure to provide warranties; a failure to set forth contracts with subcontractors; a failure to adequately describe the products and materials to be used on the job; and the failure to set forth starting and completion dates of the work." Branigan, 326 N.J.Super. at 29, 740 A.2d 643. We concluded, "[a]s we read the pertinent regulations (N.J.A.C. 13:45A-16.2), there is no requirement the "seller" set forth its contracts with subcontractors." 326 N.J.Super. at 29, 740 A.2d 643. If, per Branigan, a general contractor need not disclose to the owner contracts with subcontractors, it would not make sense to say the CFA applies to subcontractors.

III
We find that the CFA does not apply in this situation. We reverse the attorney fee award and allow recovery on Messeka's claim for the balance of the contract still due, $3000.
Reversed.
APPENDIX A
N.J.A.C. 13:45A-16.2 states:
(a) Without limiting any other practices which may be unlawful under the Consumer Fraud Act, N.J.S.A. 56:8-1 et seq., utilization by a seller of the following acts and practices involving the sale, attempted sale, advertisement or performance of home improvements shall be unlawful hereunder:
* * *
[2.] Product and material representations: Misrepresent directly or by implication *657 that products or materials to be used in the home improvement:
[2.vii.] Are of sufficient size, capacity, character or nature to do the job expected or represented;
* * *
[6.vii.] Mislead the prospective buyer into believing that the down payment or any other sum constitutes the full amount the buyer will be obligated to pay;
* * *
[10.i.] No seller contracting for the making of home improvements shall commence work until he is sure that all applicable state or local building and construction permits have been issued as required under state laws or local ordinances; or
[10.ii.] Where midpoint or final inspections are required under state laws or local ordinances, copies of inspection certificates shall be furnished to the buyer by the seller when construction is completed and before final payment is due or the signing of a completion slip is requested of the buyer.
* * *
[11.i.] The seller shall furnish the buyer a written copy of all guarantees made with respect to labor services, products or materials furnished in connection with home improvements. Such guarantees or warranties shall be specific, clear and definite and shall include any exclusions or limitations as to their scope or duration. Copies of all guarantees or warranties shall be furnished to the buyer at the time the seller presents his bid as well as at the time of execution of the contract, except that separate guarantees or warranties of the manufacturer of products and materials may be furnished at the time such products or materials are installed.
[12.] Home improvement contract requirementswriting requirement: All home improvement contracts for a purchase price in excess of [$200], and all changes in the terms and conditions thereof shall be in writing. Home improvement contracts which are required by this subsection to be in writing, and all changes in the terms and conditions thereof, shall be signed by all parties thereto, and shall clearly and accurately set forth in legible form all terms and conditions of the contract, including, but not limited to, the following:
[12.i.] The legal name and business address of the seller, including the legal name and business address of the sales representative or agent who solicited or negotiated the contract with the seller;
[12.ii.] A description of the work to be done and the principal products and material to be used or installed in performance of the contract. The description shall include, where applicable, the name, make, size, capacity, model, and model year of principal products or fixtures to be installed, and the type, grade, quality, size or quantity of principal building or construction materials to be used. Where specific representations are made that certain types of products or materials will be used, or the buyer has specified that certain types of products are to be used, a description of such products or materials shall be clearly set forth in the contract;
[12.iii.] The total price or other consideration to be paid by the buyer, including all finance charges. If the contract is one for time and materials, the hourly rate for labor and all other terms and conditions of the contract affecting price shall be clearly stated;
[12.iv.] The dates or time period on or within which the work is to begin and be completed by the seller;

*658 APPENDIX AContinued
[12.v.] A description of any mortgage or security interest to be taken in connection with the financing or sale of the home improvement; and
[12.vi.] A statement of any guarantee or warranty with respect to any products, materials, labor or services made by the seller.
NOTES
[1] N.J.A.C. 45A-16.2 defines "seller" rather generally:

"Seller" means a person engaged in the business of making or selling home improvements and includes corporations, partnerships, associations and any other form of business organization or entity, and their officers, representatives, agents and employees.
[2] Other jurisdictions with similar home improvement contracting laws include California, West's Ann.Cal.Bus. Prof.Code 7150 et seq. (not specifically excluding the construction of a new home, with no cases interpreting such language); Indiana, West's A.I.C. XX-X-XX-X (defining home improvement to exclude the construction of "an original dwelling," with no cases interpreting that language); Massachusetts, M.G.L.A. 142A 17 (including subcontractors within the scope of the law, but no cases interpreting the statutory language); New York, McKinney's General Business Law 770 (excluding the sale or construction of a new home); and Wisconsin, Wis. Admin. Code ATCP 110.01 to 110.08 (with regulations that appear identical to New Jersey's regulations, and excluding from application construction of new residence, but no cases interpreting such language).