866 A.2d 1035 (2005)
375 N.J. Super. 120
Troy SPRENGER, Plaintiff-Appellant,
v.
Robert E. TROUT, Sr. and Bridgeton Spring & Welding, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Submitted January 5, 2005.
Decided February 14, 2005.
*1037 Lummis, Krell & Baker, attorneys for appellant (Theodore E. Baker, Bridgeton, on the brief).
Christopher Tirrell, Bridgeton, attorney for respondents.
Before Judges NEWMAN, AXELRAD and HOLSTON, JR.
The opinion of the court was delivered by
*1038 HOLSTON, JR., J.A.D.
Defendants, Robert E. Trout, Sr. (Trout) and Bridgeton Spring and Welding (BSW), appeal the August 9, 2002 judgment in favor of plaintiff, Troy Sprenger, entered upon a jury verdict. The jury verdict determined that defendants violated the Consumer Fraud Act (CFA or Act) by failing to comply with the regulations pertaining to automotive repairs in the performance of customization and repair work to plaintiff's 1989 Jeep Wrangler. The jury awarded no monetary damages, finding plaintiff had not suffered an ascertainable loss proximately caused by defendants' violation of the regulations enacted pursuant to the Act. Defendants appealed the judgment to this court. However, the July 17, 2003 opinion of this court dismissed the appeal as interlocutory, since the trial court had not yet entered an award of counsel fees or an order for the return of the vehicle to plaintiff. On April 30, 2004, an order was entered releasing plaintiff's vehicle to plaintiff's possession and awarding plaintiff's counsel attorneys' fees in the amount of $7,992 and costs in the amount of $220.[1] This appeal followed. We affirm.
In September 1997, plaintiff brought his 1989 Jeep Wrangler and an engine for installation into the Jeep Wrangler to defendants for customization and repair work. The purpose of defendants' work, according to defendants, was to provide plaintiff with a show-quality, off-the-road vehicle able to be entered in car shows. Plaintiff testified that although he expected the vehicle to be "show quality," he also wanted the vehicle for personal use and believed that as customized, it would be legal to do so.
Defendants contend that the vehicle as customized was not legally drivable on the highways because the pollution control system had been removed, and the vehicle's height was substantially in excess of legal requirements. Defendants claim that the customization work was undertaken with the understanding that as completed, the vehicle could not be driven on the streets. Defendants assert they would not have taken the job if they had been advised plaintiff wanted to use the vehicle on the public streets.
Plaintiff testified that the oral estimate with defendants, as initially quoted, was to install an engine, transmission and suspension system. Plaintiff was to supply most of the required parts, the bulk of which plaintiff would obtain from his employer, an auto parts dealership. Defendants gave a verbal estimate of $1,800 and four weeks to complete the work. Plaintiff accepted. During the course of the work, the scope of the work changed as plaintiff requested that defendants install additional parts. The additional parts, which totaled twenty-three different items, included an exhaust manifold, carburetor, valve cover, camshaft, timing chain, and a shackle reversion kit. Additional work included customizing the motor mount brackets, installing spacers and shock absorbers, extending brake lines, modifying the engine with high performance racing parts, sandblasting parts, including the axle and rear, and the cleaning and painting of parts. Many parts had to be fabricated or newly created to custom create an entirely new vehicle.
Defendants did not provide plaintiff, either at the time of the initial estimate or at any time thereafter, with a written estimate of costs or a written statement by which plaintiff waived his right to a written estimate. However, time records were *1039 kept and presented to plaintiff on a regular basis as the quality and the scope of the work increased. Because many parts had to be added, plaintiff was verbally informed by Trout almost immediately after the engine and initial parts were presented for installation that "this had to be a time and material job, because a lot of this work nobody's done before." Trout testified that because "this was all custom work," there was no way to come up with an accurate cost estimate. According to Trout and George Mazzoli (Mazzoli), the BSW office manager, every time plaintiff came into the shop, the time records log folder would be shown to him. The hours worked on the vehicle were recorded daily. Additionally, the repair shop's hourly rate of $45 was posted.
In November, plaintiff requested that defendants also replace all the bushings on the vehicle. Defendants agreed but never delivered a written estimate for the additional work. On November 14, 1997, plaintiff made a payment of $2,000. Plaintiff contends that defendants advised him that the cost necessary to complete the work would be an additional $3,000 for a total of $5,000. Plaintiff claims he was not given a written bill for the work already performed nor a written estimate for additional work. Plaintiff testified that he advised defendants he could afford no more than an additional $2,000 and that he believed defendants agreed to limit the cost of additional work to $4,000. Defendants contend plaintiff indicated he was going to seek a bank loan to finance the remainder of the repairs. On December 1, 1997, plaintiff made an additional $1,000 payment for a total of $3,000. Plaintiff's final bill for parts and 244 labor hours expended was in the amount of $11,461.49. After crediting plaintiff for $3,000 paid on account, defendants demanded that the balance be paid before returning the vehicle to plaintiff. Defendants kept possession of the vehicle for six years.
Defendants present the following issues for our consideration on appeal.
POINT I
THE AUTO REPAIR REGULATIONS ARE INAPPLICABLE TO CUSTOM SHOW QUALITY WORK WITH RESPECT TO A VEHICLE WHICH IS NOT LEGAL FOR HIGHWAY USE.
POINT II
THE TRIAL COURT ERRED IN REFUSING TO ALLOW THE DEFENDANTS TO ADDUCE EVIDENCE OF AND ARGUE TO THE JURY WITH RESPECT TO THE PLAINTIFF'S UNCLEAN HANDS AND TO ARGUE THAT EQUITABLE ESTOPPEL BARRED PLAINTIFF'S CLAIM.
POINT III
THE TRIAL COURT ERRED IN FAILING TO DISMISS PLAINTIFF'S COMPLAINT WITH PREJUDICE AS A RESULT OF NON-COMPLIANCE WITH DISCOVERY ORDERS AND THE PROVISIONS OF R. 4:23-5.
Points I and II require this court to review the trial court's interpretation of the law and the legal consequences that flow from established facts. Therefore, our review is de novo. Manalapan Realty v. Manalapan Tp., 140 N.J. 366, 378, 658 A.2d 1230 (1995).

I
Prior to trial, the trial court granted plaintiff's motion in limine, determining that CFA regulations, N.J.A.C. 13:45A-26C.1 to -26C.2, applied to plaintiff's vehicle and defendants' car repair and customization business and to the customization and repair work between plaintiff and defendants.
Judge Curio stated:

*1040 [T]his act is to be construed liberally. It's designed to be to the benefit of the consumers. And although perhaps the defendant doesn't consider himself to be an automobile repair shop or to be a business that ought to come under these provisions, a reading of these provisions really leaves me no choice but to conclude that these regulations do apply, that this is work that is being done on the  on the vehicle. That this does fit into all of the definitions of motor vehicle and it is registered. That's the definition under the regulations themselves. I really am hard pressed to see any conclusion but that this is an automobile repair situation and, therefore, the  as that concept is elucidated through the case law. And so I can't come to any conclusion but that these regulations do apply.
Defendants point out that plaintiff's vehicle, when brought to them, had no engine, the vehicle and engine each having been delivered separately. No evidence produced at trial or argued in support of the motion in limine supports the position that this vehicle could have been legally operated on the highway or that the work on the vehicle constituted either maintenance or repair. Defendants argue that because the vehicle was not "roadworthy" and could not have been driven legally upon the public highways, the vehicle was not one subject to the registration requirements of N.J.S.A. 39:3-4 and, therefore, the CFA and the automotive repair regulations do not apply to this customized or refabricated vehicle.[2] We disagree.
N.J.S.A. 56:8-48 states, "The director [of consumer affairs] shall adopt ... rules and regulations necessary to effectuate the purposes of [the] act."
The following definitions appear in N.J.A.C. 13:45A-26C.1:
"Automotive repair dealer" means any person who, for compensation, engages in the business of performing or employing persons who perform maintenance, diagnosis or repair services on a motor vehicle or the replacement of parts including body parts[.]
....
"Repair of motor vehicles" means all maintenance and repairs of motor vehicles performed by an automotive repair dealer but excluding changing tires, lubricating vehicles, changing oil, installing light bulbs, batteries, windshield wiper blades and other minor accessories and services.
[(emphasis added).]
Because "repair" is not specifically defined by N.J.A.C. 13:45A-26C.1, we examine the dictionary definition of "repair" to determine its ordinary and popular meaning. In Webster's Ninth New Collegiate Dictionary,"repair" is defined as "to restore by replacing a part[.]" Webster's Ninth New Collegiate Dictionary 998 (9th ed.1984). A "repair dealer" is not dictionary-defined. However, a "repairman" is defined as "one whose occupation is to make repairs in a mechanism[.]" Ibid.
In this case, Trout testified as follows: "We also have an automotive machine shop that we've added. And as part of that, we do a lot of driveshaft work where we repair drive shafts, we rebuild new drive shafts, we can lengthen them, shorten them." (emphasis added).
*1041 Clearly, Trout's occupation and that of BSW is that of an "automotive repair dealer." Likewise, defendants' customization and refabrication work is encompassed in the statutory definition of "repair of motor vehicles."
N.J.A.C. 13:45A-26C.2 defines "deceptive practices," in applicable part, as follows:
[T]he following acts or omissions shall be deceptive practices in the conduct of the business of an automotive repair dealer, whether such act or omission is done by the automotive repair dealer or by any mechanic, employee, partner, officer o[r] member of the automotive repair dealer:
1. Making or authorizing in any manner or by any means whatever any statement, written or oral, which is untrue or misleading, and which is known, or by which the exercise of reasonable care should be known, to be untrue or misleading.
2. Commencing work for compensation without securing one of the following:
(i) Specific written authorization from the customer, signed by the customer, which states the nature of the repair requested or problem presented and the odometer reading of the vehicle[.]
....
3. Commencing work for compensation without either:
(i) One of the following:
(1) Providing the customer with a written estimated price to complete the repair, quoted in terms of a not-to-exceed figure; or
(2) Providing the customer with a written estimated price quoted as a detailed breakdown of parts and labor necessary to complete the repair.
....
(4) Obtaining from the customer a written authorization to proceed with repairs not in excess of a specific dollar amount.
(5) If the customer waives his right to a written estimate in a written statement, signed by the customer, obtaining from the customer oral approval of an estimated price of repairs, evidenced by a notation on the repair order or invoice of the estimated price of repairs, date, time, name of person approving such estimate, and the telephone number, if any, at which such person was contacted; or
....
6. Charging the customer for work done or parts supplied in excess of any estimated price given, without the oral or written consent of the customer, which shall be obtained after it is determined that the estimated price is insufficient and before the work not estimated is done or the parts not estimated are supplied. If such consent is oral, the dealer shall make a notation on the repair order and on the invoice of the date, time, name of person authorizing the additional repairs and the telephone number called, if any, together with a specification of the additional parts and labor and the total additional cost.
....
11. Failure to post, in a conspicuous place, a sign informing the customer that the automotive repair dealer is obliged to provide a written estimate when the customer physically presents his motor vehicle to the automotive repair dealer during normal working hours and, in any event, before work is commenced. In addition, copies of any receipt or document signed by the customer, a detailed invoice, a written copy of any guaranty and the return of any replaced *1042 parts that have been requested must be provided.
A violation of any of these requirements violates the CFA. Defendants' good faith makes no difference. The Supreme Court has held that mere proof of a regulatory violation is enough to establish wrongful conduct under the CFA. Cox v. Sears Roebuck & Co., 138 N.J. 2, 18-19, 647 A.2d 454 (1994). Intent is irrelevant since the regulations impose strict liability. Ibid.; Huffmaster v. Robinson, 221 N.J.Super. 315, 321, 534 A.2d 435 (Law Div.1986). See also Leon v. Rite Aid Corp., 340 N.J.Super. 462, 468, 774 A.2d 674 (App.Div.2001).
Skeer v. EMK Motors, Inc., 187 N.J.Super. 465, 455 A.2d 508 (App.Div.1982), is similar to this case. There, we found the defendant had committed a deceptive practice in violation of the automotive repair regulations. The deceptive practice was beginning work for compensation without securing a specific written authorization from the customer stating the nature of the repair and providing the customer with a written estimate. Id. at 467, 455 A.2d 508. We stated:
Violation of the act can be shown even though a consumer has not in fact been misled or deceived. N.J.S.A. 56:8-2. It is not necessary to show actual deceit or a fraudulent act; any unconscionable commercial practice is prohibited. A merchant's subjective good faith does not excuse technical noncompliance with regulations promulgated under the Consumer Fraud Act. The act is broadly designed to protect the public, even when a merchant acts in good faith. We must read its remedial provisions with that purpose in mind.
[Id. at 470, 455 A.2d 508 (citations omitted).]
The significance of the automotive repair regulations is to prevent a situation where the consumer is presented with a final bill that far exceeds the anticipated cost of repairs. A writing defining the expected cost of repairs or the consumer agreeing to a waiver of a written estimate of costs satisfies the regulations. Neither a written estimate nor a waiver of a written estimate was presented to plaintiff. Instead, plaintiff was presented with a final statement showing a balance owed of $11,461.49. Thus, the violation goes to the very essence of what the regulations are designed to accomplish.

II
Defendants contend that the regulations do not apply to the automotive customization work completed for plaintiff because the Jeep Wrangler was not "roadworthy" and the customization and refabrication work was not for the purpose of making the vehicle legally drivable on the public highways of the State.
N.J.A.C. 13:45A-26C.1 defines "motor vehicle" as "a passenger vehicle that is registered with the Division of Motor Vehicles of New Jersey or of any other comparable agency of any other jurisdiction, and all motorcycles, whether or not registered." (emphasis added). In addition, N.J.S.A. 39:3-4 provides: "Except as hereinafter provided, every resident of this State and every nonresident whose automobile or motorcycle shall be driven in this State shall, before using such vehicle on the public highways, register the same, and no automobile or motorcycle shall be driven unless so registered." Nowhere in either the statute or regulations is it required that a "motor vehicle" be deemed "roadworthy." Plaintiff produced evidence at trial that his 1989 Jeep Wrangler was, in fact, registered with the Division of Motor Vehicles when defendants worked on it.
*1043 The CFA was designed as remedial legislation to protect the interests of consumers. There is no doubt that the CFA applies to motor vehicles. In fact, motor vehicle repair agencies and the abuses they heap upon consumers are one of the areas specifically targeted for redress by the CFA. Levin v. Lewis, 179 N.J.Super. 193, 200, 431 A.2d 157 (App.Div.1981). To avail himself of the protections of the CFA and its regulations, plaintiff need only show that his 1989 Jeep Wrangler is a motor vehicle as defined by the regulations to the Act. Plaintiff's vehicle meets this definition.
Defendants seek to add an additional requirement of "roadworthiness" not contained in the regulations. The only requirement under the CFA is that such a vehicle be registered with the Division of Motor Vehicles. Defendants may not impose a greater burden upon plaintiff than that set forth by the appropriate statutes and regulations. Courts have consistently rejected creative attempts to narrow the scope of the CFA by technical definitions and artificial distinctions.
In Levin, we held that a business which repaired and replaced parts of motor vehicles for compensation was that of an "automotive repair dealer" rather than a person engaged in the restoration and remanufacture of antique automobiles. Hence, we concluded that despite the fact that the purpose of the repairs was for preservation or show of antique and classic cars rather than keeping the car in ordinary running condition, the business fell within the CFA and its regulations. Id. at 199-200, 431 A.2d 157. This court agreed with the analysis of the administrative law judge who explained:
Restoration, in his operation, is but a specialized kind of diagnosis, repair and/or replacement or [sic] automobile engine and body parts. Though one aim of restoration is perhaps the vanity of show, the obvious end purpose of restoration is the return to automotive machine function and condition of disabled or deteriorated vehicles. Respondent has not limited his business of restoration to historic motor vehicles at least 25 years old, which if owned as collectors' items and used solely for exhibition and educational purposes by their owners may be specifically so registered and licensed. See N.J.S.A. 39:3-27.3.
....
There is no question that Respondent repairs and replaces parts of motor vehicles for compensation. His business is not limited to commercial or industrial establishments, and the two complainants herein clearly retained his services as individuals. The application of the Consumer Fraud Act and its accompanying auto repair regulation (N.J.A.C. 13:45A-7) is not limited to any narrow class of individuals.
We agree with the analysis of the law judge as affirmed by the Director. "To restore," as used in this context, is defined as "to bring back from a state of injury or decay or from a changed condition (as by repairing or retouching)." Webster's Third New International Dictionary (1971), at 1936.
....
Furthermore, it is essential to recall that the regulations are designed to deal with deceptive practices in the automobile repair business and were adopted pursuant to the authority of the Consumer Fraud Act. N.J.S.A. 56:8-1 et seq. When viewed as part of the general scheme of the act, the regulations should be liberally construed in favor of the consumer.
[Ibid.]
Clearly, the statutory language does not require that a vehicle be "roadworthy" before *1044 the CFA registration regulation applies. Just as this court declined to create an exception from the application of the CFA for an antique car, we hold that defendants' business of customizing and refabricating automobiles falls within the provisions of the CFA and its promulgated regulations. The regulations require that the consumer be provided the protection of a written estimate when dealing with an automotive repair dealer. The protection of a written estimate likewise applies when the work performed is to allow the vehicle to be used off-road and entered into car shows. Defendants, clearly, are an automotive repair dealer as defined by the CFA and are subject to the regulations of the Act.

III
The trial court also granted plaintiff's in limine motion to exclude testimony that plaintiff wrongfully or illegally obtained parts that were used in the customization of his vehicle. Defendants claimed that before the "motor drop in" and "transmission hook up" job was undertaken, plaintiff provided defendants with additional parts for installation. Plaintiff testified in his deposition that he purchased the parts from Beacons, his employer.
Defendants assert that the combination of plaintiff's inability to provide evidence that he paid for the parts he delivered to defendants for installation, plaintiff's attorney's stipulation at plaintiff's deposition that plaintiff had not yet paid for many of the parts, and the representation of defendants' counsel that plaintiff's employer would testify that the employer's signature was forged on various invoices for parts, that he did not authorize plaintiff to take various parts, and that there is no record evidencing that the parts supplied were paid for, would establish that the parts were either the result of plaintiff's theft or conversion from his employer. Defendants argue that if, as they contend, stolen or unauthorized parts were brought by plaintiff to defendants' business, plaintiff should not be able to assert a CFA cause of action against their custom repair business which was enticed to use those parts and thereby take advantage of the treble damages provision of the CFA. Defendants admit that the theft or conversion of parts by plaintiff, if true, did not constitute an inducement of them by him to violate the CFA. They state, however, that "the law doesn't aid someone in the course of a wrong." Defendants contend that the doctrine of "unclean hands" should, therefore, be permitted as a defense to plaintiff's right to recover under the CFA for a technical violation of the automotive repair regulations promulgated pursuant to the Act.
Judge Curio, in granting plaintiff's motion in limine, stated:
I have some concerns about this theory. One is that I'm not satisfied that based upon the proffer that's been made that there's sufficient evidence that in fact this is a theft. To say that there's no evidence of payment and the usual procedures may not have been followed is still a far cry from a conclusion that this is a theft. And still a far cry from the conclusion that this constitutes unclean hands and that the plaintiff ought not have the protection of the Consumer Fraud Act.
Another concern that I have has to do with relevance. If we leave aside unclean hands, frankly my determination is there's no relevance. If we focus on unclean hands, there may be relevance to that particular issue but the problem then as I mentioned earlier it becomes the flimsiness of the purported evidence on that score.

*1045 And finally and perhaps more importantly I have not ascertained any authority that would suggest conclusively that even under these circumstances that if there were a clear demonstration of unclean hands that the  there would be an absolute bar to application of the Consumer Fraud Act.
Obviously the Consumer Fraud Act it's axiomatic, is to be given liberal interpretation. It's to be read in such a way as to benefit the consumer.
The CFA was enacted to "protect [the consumer] against fraudulent and unconscionable practices in the sale of goods and services." Marascio v. Campanella, 298 N.J.Super. 491, 500, 689 A.2d 852 (App.Div.1997). The purposes of the Act are: (1) to compensate the victim for his or her actual loss; (2) to punish the wrongdoer through the award of treble damages; and (3) to attract competent counsel to counteract the "community scourge" of fraud by providing an incentive for an attorney to take a case involving a minor loss to the individual. Lettenmaier v. Lube Connection, Inc., 162 N.J. 134, 139, 741 A.2d 591 (1999). The Act is "remedial legislation and should be liberally construed to accomplish its dual objectives of deterrence and protection." Joe D'Egidio Landscaping v. Apicella, 337 N.J.Super. 252, 258, 766 A.2d 1164 (App.Div.2001) (citing Lettenmaier, supra, 162 N.J. at 139, 741 A.2d 591).
No New Jersey case has been cited or found that has applied the equitable doctrine of "unclean hands" in a consumer fraud context. The doctrine, however, has been considered in a consumer protection act context in Illinois. In Ho-Chunk Nation v. J.C. Penney Co., Inc., No. 98 C 3924, 1999 WL 1068700, at *4 (N.D.Ill. November 17, 1999), a case in which injunctive relief was sought by the plaintiff under Illinois' CFA, the court stated:
The most common formulation of the "unclean hands" doctrine in recent Illinois cases is that "one seeking equitable relief cannot take advantage of his own wrong." Polk Bros., Inc., v. Forest City Enter., Inc., 776 F.2d 185 (7th Cir.1985) (citing Fair Automotive Repair, Inc. v. Car-X Service Sys., Inc., [128 Ill.App.3d 763, 84 Ill.Dec. 25] 471 N.E.2d 554, 558 (Ill.1984)). If the plaintiff creates or contributes to the situation on which it relies, the court denies equitable relief in order to deter the wrongful conduct. Id."One who has defrauded his adversary to his injury will not be heard to assert a right in equity." Fruhling v. County of Champaign, [95 Ill.App.3d 409, 51 Ill.Dec. 508] 420 N.E.2d 1066, 1071 (Ill.[App.]1981).
However, in Chow v. Aegis Mortgage Corp., 286 F.Supp.2d 956, 964 (N.D.Ill.2003), the court determined that unclean hands is an equitable remedy and is not an available defense to claims for monetary relief. As in Chow, plaintiff's complaint seeks money damages and no equitable remedy is demanded.
Additionally, the allegation of unclean hands here does not refer to a wrong perpetrated by plaintiff against defendants but rather by plaintiff against his own employer. There is no suggestion of a connection between the origin of the parts and a violation of the CFA. Even if the parts were acquired by theft from plaintiff's employer, that conduct would not bar recovery under the CFA against defendants. It may provide a basis for a cause of action by plaintiff's employer against plaintiff based on the tort of conversion. If plaintiff's employer contends a crime has been committed, the employer could lodge a criminal complaint. However, those facts do not provide a basis to invalidate a CFA cause of action with respect to *1046 defendants' contractual relationship with plaintiff.
However, cases from this court recognize that the principle of equitable estoppel may be applicable in a CFA context. In D'Egidio, the contractor sued the homeowner seeking monies owed for paving his driveway. D'Egidio, supra, 337 N.J.Super. at 255, 766 A.2d 1164. This court held that the homeowner was equitably estopped from relying on a regulation adopted under the CFA that requires all home improvement contracts over $200 to be in writing. Id. at 256, 766 A.2d 1164. We noted that the homeowner, not the contractor, insisted that a written contract was not necessary and that the homeowner was in the home improvement business himself and should have been aware of the requirement. "[S]uch a result [was] unacceptable; one who induces the alleged wrongdoing should not benefit as a result of it." Id. at 257, 766 A.2d 1164 (citing Sears Mtge. Corp. v. Rose, 134 N.J. 326, 346, 634 A.2d 74 (1993)).
In relying on the doctrine of equitable estoppel, this court explained:
Equitable estoppel has been defined as "the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed ... as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse ..." The doctrine is "designed to prevent a party's disavowal of previous conduct if such repudiation `would not be responsive to the demands of justice and good conscience'."
[Id. at 258, 766 A.2d 1164 (quoting Heuer v. Heuer, 152 N.J. 226, 237, 704 A.2d 913 (1998) (internal citations omitted)).]
Two months later, this court again considered whether or not equitable estoppel should be applied in a CFA case. In Scibek v. Longette, 339 N.J.Super. 72, 770 A.2d 1242 (App.Div.2001), an automotive repair dealer sued a customer for services rendered on his vehicle. The customer counterclaimed for violations of the CFA regulations. This court relied on the decision in D'Egidio and found that equitable estoppel should not apply because there was nothing in the record to indicate that the customer "did anything to cause plaintiff to violate the Act[ ]" and that the customer should be entitled to its protections. Id. at 85, 770 A.2d 1242.
This court again considered whether or not to apply the doctrine of equitable estoppel in Messeka Sheet Metal Co., Inc. v. Hodder, 368 N.J.Super. 116, 129, 845 A.2d 646 (App.Div.2004). In that case, this court relied heavily on D'Egidio and found that equitable estoppel could apply in a home improvement context. However, we held that the subcontractor was not subject to the provisions of the CFA. Id. at 127-29, 845 A.2d 646. Rather, the general contractor should be responsible under the Act since he was the one directly involved in the project and had direct contact with the homeowner. Id. at 129, 845 A.2d 646.
Although equitable principles in an appropriate case can operate as a defense to the CFA, each case must be examined on its own specific facts and circumstances in order to determine its applicability. Here, it was not plaintiff's conduct that caused defendants to agree to continue to repair and customize the jeep. There was, therefore, no detrimental reliance entitling defendants to the defense of equitable estoppel under these facts. The fact that plaintiff repeatedly brought more and more parts over the course of the repair and customization work may have induced *1047 defendants to continue the job but did not induce them to violate the CFA.
Defendants contend that the nature of the customization job as it evolved required that the job be billed on a "time and material basis." The ever-changing nature of the work and the fact that parts had to constantly be fabricated or refabricated made an accurate cost estimate an impossibility.
Trout testified:
You can't put ... an estimate on ... how long does it take to clean a block, how long does it take to clean an oil pan, you just don't have set times for doing that. For flipping springs or arch an extra leaf on the springs, yes, we have precise prices for that, but this was all custom work, and there's just absolutely no way to know what kind of a problem we were going to run into. So we had to keep a log, time and material only.
Plaintiff testified that he was not presented with a written estimate, written waiver of a written estimate or a written authorization to perform the work either prior to or after defendants commenced work on the vehicle. Additionally, plaintiff did not recall seeing anywhere in the shop or facility a sign posted notifying of the right to have a written estimate. As to his understanding of the total cost of the customization, plaintiff was asked:
Q. How much  did you have an idea in your mind as to what you thought the addition of work was going to cost beyond the original $1,800 estimate?
A. When I took the stuff to him, I was thinking maybe it would be another $500 on top of it.
Q. Did he say anything to lead you to believe that it would be more than that amount?
A. No.
Q. Did he tell you at that time that he was going to bill you on a time and material basis in addition to the amount that he quoted you?
A. No, he did not.
Even accepting as true defendants' contention that a written estimate with a definitive contract price, given the nature of the ever evolving customization work, could not accurately be given, defendants offer no reasonable explanation why defendants could not have secured from plaintiff a written waiver of a written estimate as required by the regulations. This is true even if the time records, which were available for plaintiff to examine each time he came to the premises and which plaintiff admitted receiving a copy of in November, when he made a $2,000 payment, could be considered in the nature of a written estimate in substantial compliance with the regulations.
The equitable doctrine of substantial compliance does not apply, however, under these facts. The purpose of the doctrine is to avoid the harsh consequences that flow from technically inadequate actions that nonetheless meet a statute's underlying purpose. Our Supreme Court expressed the limitations of the doctrine in Galik v. Clara Maass Med. Ctr., 167 N.J. 341, 353, 771 A.2d 1141 (2001). The Court stated:
To be sure, not every non-complying act is salvageable under the substantial compliance doctrine. In Bernstein[ v. Bd. of Trustees of Teachers' Pension and Annuity Fund, 151 N.J.Super. 71, 376 A.2d 563 (1977)], supra, where the doctrine was invoked by the court in the pension context, its elements were set forth with specificity:
A canvass of the cases dealing with the application of the equitable doctrine of substantial compliance indicate the following considerations: (1) the lack of *1048 prejudice to the defending party; (2) a series of steps taken to comply with the statute involved; (3) a general compliance with the purpose of the statute; (4) a reasonable notice of petitioner's claim, and (5) a reasonable explanation why there was not a strict compliance with the statute.
There is no reasonable explanation offered as to why strict compliance with the statute could not have been achieved by obtaining a written waiver. This is particularly true in this case because plaintiff visited the shop on numerous occasions to bring additional parts and on a few occasions to review the time records. On any of these occasions, a written waiver could have been presented to plaintiff for his signature. Additionally, there is no testimony in the record disputing plaintiff's testimony that defendants failed to post a sign informing a customer of the automotive repair dealer's obligation to provide a written estimate before work is commenced as required by the regulations.
The trial court properly granted plaintiff's motion barring testimony alleging that plaintiff wrongly acquired certain automotive parts. The equitable defenses of unclean hands and equitable estoppel do not apply to defeat plaintiff's claim of defendants' technical violation of the CFA. Likewise, defendants' non-compliance with at least two of the regulations, without reasonable explanation for defendants' failure of compliance, bar the application of the equitable doctrine of substantial compliance.
We hold that: (1) defendants' business of customizing and refabricating automobiles is that of an automotive repair dealer subject to the regulations of the CFA; (2) the automotive customization work between plaintiff and defendants was for a registered motor vehicle and is within the application of the automotive repair regulations, notwithstanding that, as customized, the reconfigured vehicle is not legal for highway use; and (3) the trial court properly refused to permit testimony with respect to the alleged wrongful obtaining of parts by plaintiff as the equitable defenses of unclean hands, equitable estoppel, and substantial compliance are not available under the facts of this case.

* * * * * *
[At the direction of the court, per R. 1:36-3, the discussion of the other issue in the appeal has been omitted from the published version of the opinion.]

* * * * * *
Affirmed.
NOTES
[1] The court's award of attorneys' fees and costs and the order requiring the return of the vehicle are not challenged in defendants' enumeration of appealable issues.
[2] The case was submitted to the jury solely on the basis that the automotive repair regulations applied, and the jury was requested to determine whether defendants had failed to comply with the regulations. Plaintiff conceded that there was no unconscionable conduct on the part of defendants and that the work was not defective.