**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3986-23

RUTGERS, THE STATE
UNIVERSITY OF NEW JERSEY,

      Plaintiff-Appellant,

v.

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS -
BIOMEDICAL AND HEALTH
SCIENCES OF NEW JERSEY,

      Defendant-Respondent.

_____

        Argued September 10, 2025 – Decided October 6, 2025

        Before Judges Gooden Brown and DeAlmeida.

        On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-4768-23.

        James P. Lidon argued the cause for appellant (McElroy, Deutsh, Mulvaney & Carpenter, LLP, attorneys; James P. Lidon, of counsel and on the briefs).

Justin Schwam argued the cause for respondent (Weissman & Mintz, LLC, attorneys; Justin Schwam, of counsel and on the brief).

PER CURIAM

Plaintiff Rutgers, the State University of New Jersey appeals from the Law Division's July 3, 2024 order confirming an arbitration award reinstating a part-time professor and granting the application of the professor's union, defendant American Association of University Professionals – Biomedical and Health Sciences of New Jersey, for attorney's fees and costs. Because the order does not set the amount of attorney's fees and costs awarded to defendant it is interlocutory. Plaintiff's notice of appeal was therefore premature and did not establish jurisdiction in this court.

However, because the parties have briefed the substantive issues with respect to the validity of the arbitration award and in light of defendant's failure to address the attorney's fees award in its merits brief, we sua sponte grant leave to appeal from the July 3, 2024 order. We affirm the provisions of the July 3, 2024 order confirming the arbitration award and reverse the provisions of the July 3, 2024 order awarding attorney's fees and costs to defendant.

I.

On January 5, 2009, the former University of Medicine and Dentistry of New Jersey ("UMDNJ") appointed Dr. Lily Arora, a psychiatrist, as a part-time Physician Specialist for the University Behavioral Health Center (UBHC). In that position, Arora evaluated patients for medication.

On July 8, 2010, UMDNJ appointed Arora as a part-time Clinical Assistant Professor, non-tenure, in the Department of Psychiatry (DOP) at the UMDNJ – New Jersey Medical School (NJMS) on a part-time basis. To maintain her part-time employee status and benefits Arora was required to work twenty hours per week. Arora's responsibilities included "patient care activities[,]" providing "direct clinical care to UBHC patients[,]" and developing, implementing, and evaluating "plans for treatment of UBHC patients." Under the terms of the appointment, Arora agreed "to take steps to ensure that [her] services [were] provided in accordance with requirements of the Medicare and Medicaid Programs and third-party payors."

At around this time, Arora started a private practice treating patients on a cash-only basis. She was not registered as a provider with commercial insurance carriers. Arora disclosed her private practice to UMDNJ, which approved her

A-3986-23

outside employment. She treated patients at both UBHC and her private practice from the time of her appointment to June 2012.

In July 2012, UBHC contracted with the New Jersey Department of Health (DOH) to provide a psychiatrist to serve as independent clinical chair of Involuntary Medication Administration Review (IMAR) panels at three State psychiatric hospitals for twenty hours per week. IMAR panels made determinations about the administration of psychotropic medications to patients without informed consent. Arora was the primary UBHC psychiatrist who provided independent psychiatric services for IMAR panels from July 2012 to December 2019. During that time, she worked twenty hours per week on IMAR panels, did not treat UBHC patients, and continued to maintain her private practice.

On August 24, 2015, plaintiff reappointed Arora as Clinical Assistant Professor retroactive to July 1, 2015.[1] The appointment letter reiterated Arora's agreement "to ensure that [her] services [were] provided in accordance with requirements of the Medicare and Medicaid Programs and third-party payors."

---

[1] Effective July 1, 2013, the New Jersey Medical and Health Sciences Education Restructuring Act, N.J.S.A. 18A:64M-1 to -43, incorporated certain schools, centers, and institutes of the former UMDNJ into plaintiff. At that time, UBHC became part of plaintiff.

On June 13, 2016, plaintiff reappointed Arora as a Clinical Assistant Professor on the professional practice track, non-tenure, in the NJMS DOP.

On April 26, 2018, plaintiff reappointed Arora as a Clinical Assistant Professor, non-tenure, on the professional practice track in the NJMS DOP. Her appointment was for one year from July 1, 2017 to June 30, 2018. The appointment letter directed Arora to enroll in the "Medicaid and Medicare Programs as required" and again required her to provide services in accordance with the requirements of those programs and third-party providers.

Arora was required to comply with Rutgers Policy 60.9.21, "Outside Employment." That policy provides the "primary work obligation" of all faculty members, including part-time faculty members, "is to the [u]niversity, school or other operational unit where he or she is employed." In addition, the policy permits faculty members to engage in outside employment only if doing so "does not constitute a conflict of interest" or "diminish" the faculty member's "efficiency in performing his or her primary work obligation at the University." Failure to comply with any policy "shall result in disciplinary action up to and including termination."

By letter dated June 22, 2018, plaintiff notified Arora of her promotion to Associate Professor, non-tenure, on the professional practice track at NJMS

DOP for a one-year term from July 1, 2018 to June 30, 2019. According to the appointment letter, Arora's responsibilities were those "assigned by [her] Department Chair and/or Division Chief/Program Director." Under this appointment, Arora continued to work twenty hours per week as the independent psychiatrist on IMAR panels and did not treat UBHC patients.

Plaintiff's contract with DOH expired on June 30, 2019, but remained in holdover status. As of December 30, 2019, plaintiff and DOH had entered a new contract requiring plaintiff to provide an independent psychiatrist for IMRA panels for only sixteen hours per week.

On December 6, 2019, Arora's supervisor, Michele Miller, informed her of the reduction in IMRA hours under the new contract with DOH. She told Arora if she wished to maintain her part-time employee status and benefits, she would be required to perform four hours per week of telepsychiatry services with UBHC patients. Miller directed Arora to enroll as a provider for insurance carriers to allow plaintiff to be paid for her telepsychiatry services.

Arora was concerned about the effect enrolling as a provider with insurance carriers would have on her cash-only private practice. She believed if she enrolled with insurance carriers she would be required to accept those carriers' insurance payments for her private patients, ending her cash-only

6

relationship with those patients.[2] She asked Miller if she could perform non-clinical duties for four hours per week to maintain her part-time employee status and benefits.

Arora also requested copies of the commercial insurance contracts she would have to sign or agree to enroll under to determine if her concerns about her private practice were valid. Plaintiff refused to provide copies of its commercial insurance contracts to Arora.

In a December 30, 2019 email, Miller directed Arora to contact her "so that we can plan together to meet the contract requirements and plan for the other four hours each week to ensure your benefit status."

In a January 6, 2020 email to Arora, Miller reiterated that "[w]e are reducing the hours of service to the [IMAR panels] to [sixteen] hours per week" and that "UBHC can assign [four] hours a week for you to provide telepsych (sic) services . . . in order to maintain your part[-]time status." Miller acknowledged Arora's desire to "look to administrative options" to meet the twenty-hours-per-week requirement and stated she would "keep that in mind going forward." Miller also informed Arora that plaintiff would give her a

---

[2] According to Arora, in her private practice she treated patients with addiction issues who wished to conceal their treatment from their employers by not seeking insurance coverage for her services.

A-3986-23

laptop to provide telepsychiatry services and requested that she schedule orientation on her new responsibilities. Miller directed Arora to provide weekly reports of her hours worked, starting January 13, 2020.

On January 8, 2020, Miller again contacted Arora to confirm her January 13, 2020 starting date for providing telepsychiatry services and again asked Arora to schedule orientation. Arora did not begin providing telepsychiatry services or schedule orientation.

On January 15, 2020, Miller again contacted Arora by email. She said her assistant would "schedule a time for us to meet either in person or by phone to plan for delivery of the telepsychiatric services." Arora did not arrange for a meeting with Miller and did not start providing telepsychiatry services.

On January 17, 2020, plaintiff reappointed Arora as Associate Professor on the professional practice track, non-tenure, for a one-year term retroactive to July 1, 2019. The appointment letter reiterated that Arora would "be expected to participate fully in the teaching, patient care, and service activities as assigned by your Department Chair." The letter described Arora's responsibilities with respect to the IMAR panels and her new obligation to "provide four hours of telepsychiatry evaluations weekly for Rutgers UBHC to ensure part[-]time employment at [twenty] hours per week." The letter also required Arora to

participate in "commercial health plans and third-party payor programs, as they are determined by Rutgers at its sole discretion."[3]

On January 21, 2020, Miller again contacted Arora to request she arrange for her orientation to provide telepsychiatry services. Arora responded the same day stating, "I have neither received my contract with UBHC nor the most recent contract between Rutgers-UBHC and DOH (reflecting the change in my responsibilities). I am waiting for both. I will be happy to meet with you once I have received them." Arora did not schedule telepsychiatry sessions.

On January 23, 2020, Miller provided Arora with a copy of the contract between plaintiff and DOH. She again asked Arora to schedule telepsychiatry sessions. Arora did not schedule telepsychiatry sessions.

On January 24, 2020, Arora responded by email as follows, "[p]lease respond to all messages sent to you by Mr. Monitto (from [defendant]) and direct all communication to him."

On Febuary 5, 2020, Miller asked Arora to attend a meeting scheduled for February 13 to review her current responsibilities.

---

[3] The January 17, 2020 letter misidentified Arora's position as Assistant Professor. In addition, defendant argues the one-year term to which Arora was appointed was not proper because union-negotiated guidelines required a minimum two-year term for an Associate Professor.

Arora did not appear at the February 13, 2020 meeting. She instead sent Miller an email stating she had not received "copies of my current contract and the past and current contract between UBHC and DOH." Arora stated her union representative was amenable to scheduling a meeting with Miller and Arora once they had a chance to review the documents she requested.

On February 27, 2020, Arora met with Miller. UBHC's Chief Financial Officer Carl O'Brien joined the meeting by telephone. The purpose of the meeting was for Arora to identify the hours she would provide telepsychiatry services and for Miller to provide her with a laptop to perform those services. Arora expressed concern during the meeting about how billing insurance carriers for her UBHC services would affect her cash-only private practice. O'Brien expressed his opinion that Arora's enrollment with insurance carriers to treat UBHC patients would not require her to accept commercial insurance patients in her private practice. O'Brien did not explain the basis for his opinion.

After the meeting, Arora again expressed her desire to perform non-clinical tasks for four hours per week to maintain her part-time employee status and benefits. She refused, however, to perform telepsychiatry services.

On February 28, 2020, Miller advised Arora by email there were no non-clinical opportunities for her to work four hours per week. She informed Arora

10

that it had been eight weeks since she fulfilled her contractual obligations to plaintiff and directed her to begin performing four hours a week of telepsychiatry services and to make up for the four hours per week she failed to work for the prior eight weeks. Miller informed Arora a failure to comply with her directive would be considered insubordination that could result in disciplinary action.

On March 4, 2020, defendant filed a grievance alleging plaintiff violated the collective negotiations agreement (CNA) between plaintiff and defendant by changing mandatorily negotiable terms and conditions of Arora's employment without negotiating with defendant. Defendant alleged plaintiff sought to increase Arora's workload, add additional hours of work per week, and possibly restructure her existing work hours and was attempting to violate "promises made to [Arora] in the past concerning her exemption from participation in the practice and structuring of her appointment, the earliest being 2012."[4]

On June 29, 2020, plaintiff denied the grievance. It found that Arora's concern about the effect of her performing telepsychiatry at UBHC on her cash-only private practice was not relevant to plaintiff's right to assign work to Arora.

---

[4] Defendant also challenged the length and timing of Arora's most recent appointment.

Plaintiff concluded, "Arora's private practice is outside the scope of her employment with the University. The University is not required to factor in any aspect of her private practice in determining her responsibilities and duties." Plaintiff also determined no evidence existed of a prior agreement to insulate Arora from patient care responsibilities. Defendant moved the grievance to arbitration, where it is pending.

On June 30, 2020, plaintiff issued a letter reappointing Arora as an Associate Professor, non-tenure, for the period July 1, 2020, through June 30, 2022. The letter reiterated Arora's obligation to provide patient care as directed by her supervisor and to participate in commercial health plans and third-party payor programs as directed by plaintiff.[5]

On July 6, 2020, Miller sent Arora an email noting she had for the prior five months refused to provide telepsychiatry services. Miller instructed Arora to inform her of the hours she would be available to perform telepsychiatry services by July 8, 2020, and to begin providing those services as of the week of July 13, 2020. Miller stated a failure to comply with her directives would be

---

[5] The June 30, 2020 letter states that Arora was required to provide five hours per week of telepsychiatry services. Plaintiff later admitted this was an error and the letter should have stated Arora was required to provide four hours per week of telepsychiatry services.

considered insubordination and a failure to perform assigned duties. Arora did not provide available hours or perform telepsychiatry services.

On July 31, 2020, Miller informed Arora plaintiff would be reviewing her continued refusal to perform telepsychiatry services.

Separately, on July 1, 2020, Miller contacted Arora to schedule her annual evaluation meeting. After an exchange of emails, Arora stated she would attend the meeting with a union representative. Miller informed Arora her union representative was not permitted to attend an evaluation meeting.

On July 31, 2020, Miller emailed Arora to advise her that refusing to attend the evaluation meeting constituted insubordination and a failure to follow directions may result in disciplinary action up to and including termination. Miller sent additional emails attempting to schedule the evaluation meeting on August 31, 2020, and September 15, 2020.

The meeting ultimately took place on October 13, 2020. Arora was accompanied by a faculty member as permitted by the CNA. She refused to discuss the telepsychiatry service assignment or sign her evaluation.

On December 11, 2020, plaintiff terminated Arora for failure to perform the duties of her position effectively, misconduct, conduct unbecoming a member of the faculty of the university, and serious violations of university

13 A-3986-23

policy. In a letter issued after Arora had an opportunity to respond to a pre-termination letter, plaintiff found Arora refused to perform the telepsychiatry services which were legitimately assigned to her by her supervisor and offered no legitimate basis for her refusal to do so. Plaintiff rejected Arora's argument her concerns about her cash-only private practice justified her refusal to provide the services and found her desire to maintain a cash-only private practice was outside the scope of her employment and of no concern to plaintiff. Plaintiff also noted that if Arora had an objection to performing her assignment, she was required by the CNA to perform the assignment and file a grievance.

In addition, plaintiff found, for months, Arora repeatedly refused to comply with her supervisor's requests to schedule a meeting to review her annual evaluation. In addition, plaintiff determined that after the October 13, 2020 meeting, Arora continued to be non-compliant with her supervisor's directives by not signing her evaluation. Plaintiff found Arora caused the delay in attending the evaluation meeting because she "questioned . . . Miller's authority and qualifications as [her] supervisor and repeatedly refused to meet with her for a myriad of reasons having no basis."

Plaintiff found Arora's conduct to be "chronic and willful" and "a serious departure from [her] core duty as a faculty member and [u]niversity employee

14

to follow the directives and instructions of [her] supervisor." Thus, plaintiff sustained each of the charges on which it terminated Arora. Plaintiff also determined Arora produced insufficient mitigating evidence to warrant imposition of a sanction less severe than termination. A December 11, 2020 letter memorialized plaintiff's decision.

Defendant appealed the termination to arbitration pursuant to the CNA. The arbitrator was presented with the following questions: "Was there just cause to discharge . . . Arora? If not, what shall be the remedy?"

After a seven-day hearing, the arbitrator issued a May 22, 2023 written determination. The arbitrator found that after the State's reduction in hours for the IMAR panels, plaintiff reasonably expected Arora to work twenty hours per week if she were to continue to receive the same level of compensation and benefits. However, the arbitrator found:

> What [plaintiff] could not do is unilaterally and materially alter the terms of her employment contract; dictate that [Arora] sacrifice her private practice, of which [plaintiff] was aware and approved since before [Arora] was hired; or demand that [Arora] register with insurance companies in a way that [Arora] believed would destroy an essential element of her private practice without at least providing relevant documentation to dispel what [plaintiff] believed was [Arora's] misconception of the consequences of accepting patients for [plaintiff].

15

The arbitrator continued:

> In order for [plaintiff's] directive to constitute a valid work order after [Arora's] communication of her professional concerns to her supervisor and other Rutgers managers, [plaintiff] was obligated to share details of any insurance contracts that [Arora] would be required to sign or that would potentially have an impact on [Arora's] private practice so that [Arora] could seek advice from an attorney or her [u]nion in order to make a timely informed decision about accepting the four-hour telepsychiatry assignment pending resolution of her grievance.

The arbitrator noted a non-disclosure agreement or redactions could have protected sensitive information while permitting Arora to evaluate the potential effect on her private practice of enrolling with plaintiff's insurance carriers. He found, "[a]s [plaintiff] was in sole control of this information, providing such contracts for review by her attorney was a reasonable request in order for [Arora] to protect her private patients. By denying access . . . [plaintiff] exacerbated a protracted standoff resulting in escalation of the discipline imposed."

The arbitrator also found O'Brien's expression at a meeting of his opinion that Arora would not be required to accept insurance payments from her private clients was conclusory and inadequate to address her concerns. The arbitrator noted plaintiff appointed Arora to her position on a part-time basis aware she maintained a private practice. This was evidenced in part, the arbitrator found,

16

by the referral of patients to Arora's private practice by her supervisor. The arbitrator also concluded an exception to the well-recognized "work now, grieve later" mandate applied because Arora risked irreparable harm to her private practice were she to enroll with plaintiff's insurance carriers.

The arbitrator concluded plaintiff's conduct was arbitrary and unreasonable "given the relative ease with which sharing access to pertinent documents and providing a detailed explanation of the basis for [plaintiff's] assurances could have been arranged so that [Arora] could seek the advice of an attorney." Thus, the arbitrator found plaintiff did not demonstrate by a preponderance of the evidence Arora engaged in misconduct justifying the summary discharge of a ten-year employee with a stellar employment history.

With respect to Arora's repeated refusals to meet with Miller to discuss her performance evaluation, the arbitrator found Arora's belief that Miller, a registered nurse, should not have been assigned to evaluate a psychiatrist did not justify her refusal to meet with Miller. However, he also concluded plaintiff delayed the meeting in part because it would not allow her to attend with a union representative. Once told a faculty colleague could attend the meeting, Arora promptly agreed to meet. The arbitrator found plaintiff exacerbated the situation by not telling Arora sooner she could have a faculty colleague attend the

meeting. In addition, the arbitrator found plaintiff did not promptly notify Arora of her option to work sixteen hours and forfeit her part-time status and benefits. He also faulted plaintiff for not reducing Arora's compensation and benefits to reflect the sixteen hours she worked per week rather than terminating her.

The arbitrator ordered plaintiff to reinstate Arora, with uninterrupted seniority, and to afford her the option of working sixteen hours per week or twenty hours per week, provided the additional four hours of duties to be determined by plaintiff are duties to which Arora agrees. He awarded Arora back pay of eighty percent of her wages from the date of her discharge to the date she declined plaintiff's offer to work sixteen hours, less any substitute interim earnings. He also directed plaintiff to reimburse Arora for the cost of her medical insurance and other terminated benefits from the date of her discharge to the date of her reinstatement. According to the arbitration award, subsequent medical insurance benefits shall be contingent on whether the parties agree on an additional four hours going forward. Otherwise, plaintiff is to offer Arora access to the medical insurance and other benefits provided to similarly situated bargaining unit employees who work sixteen hours per week. A May 22, 2023 arbitration award memorialized the arbitrator's decision.

On August 24, 2023, plaintiff filed a verified complaint in the Law Division seeking an order vacating the May 22, 2023 arbitration award. Plaintiff alleged the award was invalid because: (1) it was procured by unjust means, such as by failing to apply governing law, N.J.S.A. 2A:24-8(a); (2) the arbitrator exceeded his authority, such as by failing to credit the plain language of the CNA, N.J.S.A. 2A:24-8(d); (3) it was the product of undue means because the arbitrator disregarded well-settled law concerning non-negotiable managerial prerogatives of public employers to assign work to employees, N.J.S.A. 2A:24-8(a); (4) the arbitrator exceeded his authority by disregarding the primary jurisdiction of the Public Employees Relations Commission (PERC) to determine negotiability, N.J.S.A. 2A:24-8(d); and (5) the arbitrator exceeded his authority by modifying plaintiff's policies, N.J.S.A. 2A:24-8(d).

Defendant filed a counterclaim seeking an order confirming the arbitration award. Defendant also sought the award of attorney's fees and costs.

On July 3, 2024, the trial court issued a written decision confirming the arbitration award. The court found that the award does not question plaintiff's managerial prerogatives. To the contrary, the court found: "The [a]rbitrator specifically indicates that . . . [p]laintiff had a right to assign duties. The [a]rbitrator only indicates that . . . [p]laintiff's refusal to provide the reasonable

19

documentation . . . Arora requested was arbitrary and unreasonable and therefore, . . . precluded a . . . showing of just cause for termination." In addition, the court noted the arbitrator recognized plaintiff could have reduced Arora's hours if she continued to balk at performing telepsychiatry services.

The court also rejected plaintiff's claim the arbitrator trespassed on PERC's jurisdiction to determine negotiability. The court explained, that "[t]his argument again is based upon [p]laintiff's position that the [a]rbitrator erroneously concluded [p]laintiff's managerial prerogatives were subject to negotiations. . . . This [c]ourt agrees that this matter was not a scope of negotiations case." The court rejected the argument that the award "effectively create[d] a new legal right for employees to negotiate job assignments."

The court also found the award does not modify plaintiff's outside employment policy or ethics code or permit Arora to engage in a conflict of interest. The court noted the award does not modify or sanction Arora's private practice, but is based on plaintiff's failure to respond to Arora's well-grounded concerns about the effect her new assignment might have on her long-standing, university-approved, outside employment. The court noted "the [a]rbitrator determined that, based on the history of her employment, and her request for more information in the context of her ability to make her own decision,"

20

plaintiff's termination of Arora was not just. The court found the arbitrator's construction of the CNA to be reasonably debatable.

A July 3, 2024 order memorialized the trial court's decision confirming the arbitration award. Although the July 3, 2024 order also awards defendant attorney's fees and costs, neither the order nor the court's written decision identify the basis for the award or the amount of fees and costs awarded.

This appeal followed. Plaintiff argues the arbitration award is invalid because the arbitrator: (1) engaged in undue means by concluding plaintiff had a duty to confer with, present information and documents to, and negotiate with Arora before it could require her to perform her assigned work; (2) exceeded and imperfectly executed his authority by determining plaintiff's managerial prerogative to assign job duties was negotiable; and (3) effectively modified plaintiff's outside employment policy and ignored its code of ethics and the New Jersey Conflicts of Interest Law (COIL), N.J.S.A. 52:13D-12 to -28. In addition, plaintiff argues the court lacked authority to award defendant attorney's fees and costs and did not cite any support for its award of fees and costs.

II.

We begin with the jurisdictional issue. Under Rule 2:2-3(a)(1), an appeal as of right may be taken to this court only from a "final judgment" of the trial

court. "To be a final judgment, an order generally must 'dispose of all claims against all parties.'" Janicky v. Point Bay Fuel, Inc., 396 N.J. Super. 545, 549 (App. Div. 2007) (quoting S.N. Golden Estates, Inc. v. Cont'l Cas. Co., 317 N.J. Super. 82, 87 (App. Div. 1998)). "This rule, commonly referred to as the final judgment rule, reflects the view that 'piecemeal [appellate] reviews, ordinarily, are [an] anathema to our practice.'" Id. at 550. (quoting S.N. Golden Estates, Inc., 317 N.J. Super. at 87).

"An order is interlocutory, and not final, if it does not dispose of counsel fees issues." N.J. Mfrs. Ins. Co. v. Prestige Health Grp., LLC, 406 N.J. Super. 354, 358 (App. Div. 2009); see also Marx v. Friendly Ice Cream Corp., 380 N.J. Super. 302, 305 n.3 (App. Div. 2005); Sprenger v. Trout, 375 N.J. Super. 120, 125 (App. Div. 2005); Shimm v. Toys From The Attic, Inc., 375 N.J. Super. 300, 304 (App. Div. 2005). "[A]n order which adjudicates a liability for counsel fees and litigation expenses, but not the amount of the obligation, is only interlocutory and hence not appealable as of right." Kattoura v. Patel, 262 N.J. Super. 34, 40 (App. Div. 1993).

Although this appeal is subject to dismissal as interlocutory, the merits have been fully briefed. Therefore, pursuant to Rule 2:4-4(b)(2), we grant leave to appeal the July 3, 2024 order as if within time.

22

"Judicial review of an arbitration award is very limited, and 'the arbitrator's decision is not to be cast aside lightly.'" Linden Bd. of Educ. v. Linden Educ. Ass'n, 202 N.J. 268, 276 (2010) (quoting Bd. of Educ. of Alpha v. Alpha Educ. Ass'n, 190 N.J. 34, 42 (2006)). We review the trial court's decision with respect to the confirmation of an arbitration decision de novo. Minkowitz v. Israeli, 433 N.J. Super. 111, 136 (App. Div. 2013). "Courts should intervene only where the arbitrator has exceeded his authority or acted improperly." Office and Professional Employees Local 153 v. The Tr. Co. of N.J., 105 N.J. 442, 449 (1987).

"In the public sector, an arbitrator's award will be confirmed 'so long as the award is reasonably debatable.'" Linden Bd. of Educ., 202 N.J. at 276 (quoting Middletown Twp. PBA Loc. 124 v. Twp. of Middletown, 193 N.J. 1, 11 (2007)). An award is reasonably debatable if it is "justifiable" and "fully supportable in the record." Policemen's Benevolent Ass'n, Loc. No. 11 v. City of Trenton, 205 N.J. 422, 431 (2011) (quoting Kearny PBA Loc. # 21 v. Town of Kearny, 81 N.J. 208, 223-24 (1979)). Under the reasonably debatable standard, "a reviewing court may not substitute its own judgment for that of the arbitrator, regardless of the court's view of the correctness of the arbitrator's interpretation." N.J. Transit Bus Operations, Inc. v. Amalgamated Transit

Union, 187 N.J. 546, 554 (2006). "[O]ur courts have vacated arbitration awards as not reasonably debatable when arbitrators have, for example, added new terms to an agreement or ignored its clear language." City of Trenton, 205 N.J. at 429.

Under the New Jersey Arbitration Act, N.J.S.A. 2A:24-1 to -11, an arbitration award under a collective bargaining agreement shall be vacated:

> a. Where the award was procured by corruption, fraud or other undue means;
>
> b. Where there was either evident partiality or corruption in the arbitrators, or any thereof;
>
> c. Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause being shown therefor, or in refusing to hear evidence, pertinent and material to the controversy, or of any other misbehaviors prejudicial to the rights of any party;
>
> d. Where the arbitrators exceeded or so imperfectly executed their powers that a mutual, final and definite award upon the subject matter submitted was not made.
>
> [N.J.S.A. 2A:24-8(a) to (d).]

Whether or not the arbitrator exceeded their authority "entails a two-part inquiry: (1) whether the agreement authorized the award, and (2) whether the arbitrator's action is consistent with applicable law." Borough of E. Rutherford v. E. Rutherford PBA Loc. 275, 213 N.J. 190, 212 (2013). A court "may vacate

24                                                                    A-3986-23

an award if it is contrary to existing law or public policy." Middletown Twp. PBA Loc. 124, 193 N.J. at 11 (quoting N.J. Tpk. Auth. v. Loc. 195, IFPTE, 190 N.J. 283, 294 (2007) (internal quotation marks omitted)).

The CNA in effect at the time of Arora's termination provided:

> [U]nit members who are tenured or under a term contract shall not be terminated except for the reasons and pursuant to the procedures in this Article.
>
> A.    Grounds.
>
> The following may constitute grounds for termination:
>
> 1.    failure to perform the duties of the position effectively;
>
> 2.    misconduct;
>
> 3.    conduct unbecoming a member of the faculty of the [u]niversity; [and]
>
> . . . .
>
> 5.    serious violation of [s]chool or [u]niversity policies and procedures or other codifications governing faculty conduct.

A side letter agreement provides that the chair/supervisor and faculty member shall meet to discuss the faculty member's evaluation by July 1 each year.

"'Undue means' ordinarily encompasses a situation in which the arbitrator has made an acknowledged mistake of fact or law or a mistake that is apparent

on the face of the record." Borough of E. Rutherford, 213 N.J. at 203 (quoting Off. of Emp. Rels. v. Commc'n Workers of Am., 154 N.J. 98, 111-12 (1998)); Loc. Union 560, I.B.T. v. Eazor Express, Inc., 95 N.J. Super. 219, 227-28 (App. Div. 1967).

A managerial prerogative to assign duties exists when: (1) "'some statutory or constitutional grant of authority'" is delegated to a public employer; (2) a public employer exercises a commonly recognized managerial prerogative, "'such as the right to hire or direct the work force;'" or (3) a public employer is acting pursuant to a "'nondelegable legislative directive.'" In re City of Newark, 469 N.J. Super. 366, 379 (App. Div. 2021) (quoting Bd. of Educ. of Woodstown-Pilesgrove Reg'l Sch. Dist. v. Woodstown-Pilesgrove Reg'l Educ. Ass'n, 81 N.J. 582, 588 (1980)).

We do not agree with plaintiff's argument that the arbitrator vitiated its managerial prerogative to assign Arora's work duties. To the contrary, the arbitrator acknowledged plaintiff's right to expect Arora to work twenty hours per week and to assign her to provide telepsychiatry services. The arbitrator found plaintiff's termination of Arora was not just because it acted without responding to her reasonable request for information to assist her to determine whether to accept the assignment, with possible negative consequences to her

private practice, or to reduce her hours to sixteen a week and forfeit her part-time employee status and benefits. The arbitrator did not compel plaintiff to negotiate with Arora with respect to the terms and conditions of her employment, but found it was not just to terminate her without responding to her reasonable request for information. The arbitrator also found that termination of a long-term employee with a stellar record instead of a reduction in her hours was not just.

For the same reasons, we are not persuaded by plaintiff's argument that the arbitrator usurped PERC's primary jurisdiction in determining scope of negotiations. Under N.J.S.A. 34:13A-5.4(d) PERC has the authority to determine whether a matter in dispute is within the scope of collective negotiations, State v. State Supervisory Emps. Ass'n, 78 N.J. 54, 83 (1978). Here, however, no such determination was made by the arbitrator.

We have considered plaintiff's arguments with respect to its ethics code and the COIL and conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). The arbitration award does not require plaintiff to permit Arora to violate the university's code of ethics or COIL. If plaintiff is of the view that Arora's private practice, of which it was aware and

to which it did not object for nearly a decade, is unethical it may take whatever action it deems appropriate pursuant to the CNA.

Finally, defendant's brief does not address the provisions of the July 3, 2024 order awarding it attorney's fees and costs. "[A]n issue not briefed is deemed waived." Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2026); Telebright Corp. v. Dir., N.J. Div. of Tax'n, 424 N.J. Super. 384, 393 (App. Div. 2012) (deeming a contention waived when the party failed to include any arguments supporting the contention in its brief). Defendant's waiver and the trial court's failure to identify the legal authority on which it based the award of fees and costs warrants reversal of the portions of the July 3, 2024 order granting defendant's application.

Affirmed in part, reversed in part.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division